ALETA DEROY *v.* ESTATE OF EDITH BARON ET AL.
(AC 32902)

GLEN BARON *v.* ALETA DEROY ET AL.
(AC 33659)

Robinson, Alvord and Schaller, Js.

Argued February 1—officially released June 5, 2012

*Beth A. Steele*, for the appellant in both cases (defendant Jeanne Baron).

*Nancy E. Wildes*, for the appellee (plaintiff in the first case, defendant in the second case).

*Glen Baron*, pro se, the appellee (defendant in the first case, plaintiff in the second case).

*Opinion*

SCHALLER, J. The defendant Jeanne Baron[1] appeals from the judgments of the trial court disallowing admission of a will executed by her mother, the decedent, Edith Baron, due to lack of testamentary capacity. On appeal, the defendant contends that the trial court applied a higher legal standard to the question of testamentary capacity than is required under Connecticut law. We agree with the defendant and, accordingly, reverse the judgments of the trial court.

The following facts and procedural history are relevant to the present appeal. The decedent died on July 20, 2006. She was survived by three children: Aleta Deroy, Jeanne Baron and Glen Baron. Two documents were submitted to the Probate Court purporting to be the last will and testament of the decedent. The first will, dated February 12, 2002, devised the entirety of the decedent's estate, including the decedent's interest in an eighty-six acre farm located at 2247 Glasgo Road in the town of Griswold, to Deroy and Glen Baron in equal shares. The second will, dated July 3, 2002, devised the decedent's interest in the farm to Jeanne Baron and provided that the residue and remainder of her estate should be distributed equally to each child.[2]

---

[1] On December 3, 2008, Aleta Deroy, a daughter of the decedent, Edith Baron, filed an appeal in the Superior Court, challenging the decision of the Probate Court to admit her mother's will, dated July 3, 2002. Deroy asserted, inter alia, that her mother lacked the legal capacity to make that will. Jeanne Baron and Glen Baron, children of the decedent, and Elias Baron, the son of Jeanne Baron and grandson of the decedent, also were parties to that appeal.

In a separate appeal to the Superior Court, Glen Baron on December 2, 2008, also challenged the Probate Court's admission of his mother's July 3, 2002 will. Deroy and Jeanne Baron also were parties to Glen Baron's appeal. The Superior Court consolidated both appeals and issued a ruling in each appeal. Thereafter, Jeanne Baron filed separate appeals to this court, which we consolidated.

[2] The decedent did not possess a fee simple interest in the farm on the date of her death. On February 3, 2002, the decedent executed a deed transferring her interest in the farm to Jeanne Baron and herself in survivor-

Deroy and Glen Baron contested the admission of the second will, arguing, inter alia, that the decedent lacked testamentary capacity on July 3, 2002. The Probate Court disagreed and, accordingly, admitted the second will as the last will and testament of the decedent.[3] Deroy and Glen Baron filed separate appeals from that decision to the trial court.

The trial court revisited the question of testamentary capacity in a de novo proceeding. A two day trial commenced on November 3, 2010. At the conclusion of those proceedings, the court issued a brief oral decision concluding that the decedent was "incompetent" to execute a will on July 3, 2002. The court explained its decision as follows: "On June 10, 2002, at the request of the decedent's attorneys, Dr. Christopher Tolsdorf, a highly qualified neuropsychologist, conducted a very thorough examination of the decedent to determine

ship. Nine days later, the decedent quitclaimed her interest in the property to John Duggan, an attorney, who immediately transferred the same interest back to the decedent. Consequently, on the date of the decedent's death, Jeanne Baron and the decedent owned the farm as tenants in common. See General Statutes § 47-14c ("a conveyance of any interest or interests in any joint tenancy by less than all of the joint tenants to a person or persons other than one of the remaining joint tenants severs the joint tenancy as to the interest or interests so conveyed and the grantee or grantees thereof shall hold the interest or interests as tenant or tenants in common with the remaining joint tenant or tenants"); see also *Liscio* v. *Liscio*, 204 Conn. 502, 505–506, 528 A.2d 1143 (1987) (joint tenant's quitclaim deed to third party extinguished joint tenancy).

[3] The record reveals the following details regarding the underlying cause of the disagreement between the parties and the origin of the decedent's two wills. The decedent's husband, Eugene Baron, died unexpectedly on December 30, 2001. In January, 2002, the relationship between Jeanne Baron and Deroy deteriorated after Jeanne Baron failed to attend Eugene Baron's funeral. At about the same time, the decedent moved from the marital residence to the home of her daughter, Deroy. While she lived at this location, the decedent entered into various real estate transactions relating to the farm; see footnote 2 of this opinion; and executed the will dated February 12, 2002. In April, 2002, the decedent returned to the marital residence to live with her daughter, Jeanne Baron. Two months later, on July 3, 2002, the decedent executed the second will.

whether she was competent to make her own legal decisions. Dr. Tolsdorf concluded his report by saying: 'Given her cognitive impairments, it is unlikely that she would be able to make fully informed, thoughtful judgments regarding complex financial issues.' On the [witness] stand, he testified, based upon my questioning of him after he completed his testimony, that he felt that she was incompetent on June 10 and also was incompetent on July 3, the date of the execution of her will. He also felt that she needed a conservator, which is obviously an indication of incompetency. Based on the foregoing, the court finds that the decedent was incompetent on July 3, 2002, when she executed her will."

On appeal, the defendant claims that the trial court applied an incorrect standard of law to the question of testamentary capacity. Specifically, the defendant claims that the trial court applied a legal standard that would require a testator to possess the mental acuity necessary to make decisions regarding " 'complex financial issues.' "

"[W]hether the court applied the correct legal standard is a question of law subject to plenary review." (Internal quotation marks omitted.) *Emrich* v. *Emrich*, 127 Conn. App. 691, 702, 15 A.3d 1104 (2011); see also *Schirmer* v. *Souza*, 126 Conn. App. 759, 764, 12 A.3d 1048 (2011); *Wieselman* v. *Hoeniger*, 103 Conn. App. 591, 598, 930 A.2d 768, cert. denied, 284 Conn. 930, 934 A.2d 245 (2007). When an incorrect legal standard is applied, the appropriate remedy is to reverse the judgment of the trial court and to remand the matter for further proceedings. See *St. Joseph's Living Center, Inc.* v. *Windham*, 290 Conn. 695, 765, 966 A.2d 188 (2009) (*Schaller, J.*, concurring in part and dissenting in part).

The standard for testamentary capacity is well established. "To make a valid will, the testatrix must have

had mind and memory sound enough to know and understand the business upon which she was engaged, that of the execution of a will, at the very time she executed it." (Internal quotation marks omitted.) *Sanzo's Appeal from Probate*, 133 Conn. App. 42, 50, 35 A.3d 302 (2012); see also *Atchison* v. *Lewis*, 131 Conn. 218, 219–20, 38 A.2d 673 (1944). In *Stanton* v. *Grigley*, 177 Conn. 558, 418 A.2d 923 (1979), our Supreme Court stated: "The burden of proof in disputes over testamentary capacity is on the party claiming under the will. . . . While there is a presumption of sanity in the performance of legal acts, the party that presents a will still bears the burden of going forward with his proof, and only then does the burden shift to the opponents to prove incapacity." (Citations omitted.) Id., 564.

It is equally clear that an individual may possess the mental capacity necessary to make a will although incapable of transacting business generally. See *Turner's Appeal*, 72 Conn. 305, 317, 44 A. 310 (1899) ("Some courts have held the mental ability to execute a valid deed or contract to be the proper measure of testamentary capacity. . . . Others, that the possession of sufficient mind and memory for the transaction of ordinary business is the true test of capacity to make a valid will. . . . In this State one may make a valid will though mentally incapable of transacting business generally." [Citations omitted.]); see also 95 C.J.S., Wills § 7 (2011) ("A will is not a contract. In evaluating mental capacity, the courts apply different standards for contracts and for testamentary instruments. The minimum level of mental capacity required to make a will is less than that necessary to make a contract or a deed . . . . Likewise, less mental capacity is required for the testator to make a will than to carry on business transactions generally, or ordinary business affairs. Thus, the ability to transact business is not a true test of testamentary

capacity; the ability to transact complicated or important business, or even ordinary business, is not the legal standard of testamentary capacity. A person may execute a valid will, even if he or she is not competent to transact ordinary, everyday affairs."); 79 Am. Jur. 2d, Wills § 63 (2002) ("The law recognizes degrees of mental unsoundness, and not every degree of mental unsoundness or mental weakness is sufficient to destroy testamentary capacity. Absolute soundness of mind and memory in every respect is not essential to testamentary capacity. There is no particular degree of mental acumen which may be set up to serve as a standard for testamentary capacity. Testamentary capacity is not the same as the ability to transact ordinary business, or the capacity to execute a deed or contract.").

In the present case, the trial court's conclusion that the decedent was "incompetent" on July 3, 2002, was premised entirely on Tolsdorf's conclusion that the decedent was unable " 'to make fully informed, thoughtful judgments regarding complex financial issues' " and on Tolsdorf's belief that the decedent needed a conservator to manage her affairs. While the standard applied by the trial court was not explicitly stated in its decision, the court's exclusive recitation of and reliance on Tolsdorf's conclusions demonstrate that the court applied an incorrect standard to the question of testamentary capacity, namely, a standard that requires a testator to be able to comprehend " 'complex' " financial transactions. This standard is inconsistent with the requirements for testamentary capacity set forth by our Supreme Court. See *Turner's Appeal*, supra, 72 Conn. 317.

Although the dissent is correct to note that, under some circumstances, the failure of an appellant to seek an articulation requires the presumption that "the trial court considered all of the facts before it and applied

the correct legal standard"; *State* v. *Mathis*, 59 Conn. App. 416, 422 n.3, 757 A.2d 55, cert. denied, 254 Conn. 941, 761 A.2d 764 (2000); the application of this presumption has been limited by our Supreme Court to cases in which the trial court's reasoning is unclear or ambiguous. See *Walton* v. *New Hartford*, 223 Conn. 155, 164, 612 A.2d 1153 (1992) (applying presumption when "there is nothing in the record to indicate that the court did not consider the appropriate principles of law governing easements in Connecticut"); *Bell Food Services, Inc.* v. *Sherbacow*, 217 Conn. 476, 482, 586 A.2d 1157 (1991) ("[w]here an appellant has failed to avail himself of the full panoply of articulation and review procedures, *and absent some indication to the contrary*, we ordinarily read a record to support, rather than to contradict, a trial court's judgment" [emphasis added]). No ambiguity exists in the present case. The trial court concluded that the decedent was "incompetent" because she was unable to make decisions with respect to complex financial transactions and needed a conservator. The trial court's implicit—and exclusive—adoption of this reasoning sufficiently demonstrates that the correct legal standard was not applied to the issue of testamentary capacity. The defendant, under such circumstances, had no duty to file a motion for articulation.

The judgments are reversed and the cases are remanded for further proceedings consistent with this opinion.

In this opinion ALVORD, J., concurred.

ROBINSON, J., dissenting. I respectfully dissent from the majority's decision to reverse the trial court's judgment disallowing the admission of the will of the decedent, Edith Baron, dated July 3, 2002. I believe that because the court did not set forth the standard it

applied in determining that the decedent lacked testamentary capacity and because it is not clear from the record as to which standard the court actually applied, we should presume that the court was cognizant of the appropriate standard and applied it correctly. I also conclude that the court's determination that the decedent lacked testamentary capacity when she executed a will on July 3, 2002, was not clearly erroneous. I would therefore affirm the judgment of the trial court.

"What constitutes testamentary capacity is a question of law." *City National Bank & Trust Co.'s Appeal*, 145 Conn. 518, 521, 144 A.2d 338 (1958). When a claim presents a question of law, our review is plenary. *State* v. *Brown*, 299 Conn. 640, 650, 11 A.3d 663 (2011).

I believe that we should presume that the trial court was cognizant of the proper standard to apply in determining whether the decedent had testamentary capacity when she executed her will on July 3, 2002. See *State* v. *Koslik*, 116 Conn. App. 693, 704, 977 A.2d 275, cert. denied, 293 Conn. 930, 980 A.2d 916 (2009). "Our Supreme Court has directed that where the factual or legal basis of a trial court's decision is unclear, the appellant should file a motion for articulation. In the absence of such action, the reviewing court should presume that the trial court considered all of the facts before it and applied the correct legal standard." *State* v. *Mathis*, 59 Conn. App. 416, 422 n.3, 757 A.2d 55, cert. denied, 254 Conn. 941, 761 A.2d 764 (2000).

The majority asserts that we should presume that the trial court was cognizant of the appropriate standard only where the trial court's reasoning was unclear or ambiguous, and concludes that no such ambiguity exists in this case. While I agree with this assertion in general, in this specific case, however, I believe that there was an ambiguity in the court's decision and, therefore, the presumption is not applicable. The court

did not specifically set forth the standard it used in determining whether the decedent had testamentary capacity when executing her will. Rather, in its oral decision, the court simply noted elements of the testimony of Christopher Tolsdorf, a neuropsychologist, in reaching its conclusion that the decedent lacked testamentary capacity. Although the court did recite certain elements of Tolsdorf's testimony in its oral decision, this does not mean that it did not consider the remainder of the evidence presented and did not apply the correct testamentary capacity standard. On the basis of the record presented, it is unclear what standard the court applied and how the court evaluated Tolsdorf's testimony in regard to such standard. Further, no motion for articulation or motion for reconsideration was filed after the court issued its decision.[1] In the absence of a motion for articulation, "the reviewing court should presume that the trial court considered all of the facts before it and applied the correct legal standard." Id.

Simply noting elements of Tolsdorf's testimony on the record is insufficient to demonstrate that the court applied the wrong standard for establishing testamentary capacity. The majority fails to note the other evidence presented to the court, namely, that the decedent was suffering from severe dementia, did not understand that she could not dispose of her property evenly while still giving her daughter, Jeanne Baron, the largest asset and that the will signing was brought to a halt when there was a question of the decedent's testamentary capacity. Simply because the court did not reference

---

[1] The majority concludes that a motion for articulation was unnecessary because the decision was not ambiguous. I believe, however, that the decision was ambiguous, and that an articulation would have been beneficial in this case due to the claim that the trial court applied the wrong standard in determining testamentary capacity. I disagree with the majority's conclusion that the standard that the court used in making its determination is clear from the record presented, as the court issued an oral decision consisting of only a few sentences and at no point stated the standard to be applied.

this evidence in its short oral decision does not mean that the court did not consider it and that it did not impact the court's determination. When the record does not reveal the basis of the Superior Court's decision, "[w]e do not presume error; the trial court's ruling is entitled to the reasonable presumption that it is correct unless the party challenging the ruling has satisfied its burden demonstrating the contrary." (Internal quotation marks omitted.) *State* v. *Baker*, 50 Conn. App. 268, 275 n.5, 718 A.2d 450, cert. denied, 247 Conn. 937, 722 A.2d 1216 (1998). Because I believe that the standard the court employed in reaching its decision is unclear, I would presume that the court was cognizant of the appropriate standard to be applied in determining testamentary capacity.

Because I conclude that the court was cognizant of the appropriate standard to apply, I next address Jeanne Baron's claim that the court's determination that the decedent lacked testamentary capacity when she executed a will on July 3, 2002, was clearly erroneous based on the evidence presented at trial. "To make a valid will, the testatrix must have had mind and memory sound enough to know and understand the business upon which she was engaged, that of the execution of a will, at the very time she executed it. . . . Whether she measured up to this test is a question of fact for the trier." (Citation omitted.) *City National Bank & Trust Co.'s Appeal*, supra, 145 Conn. 521. "Questions of fact are subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence . . . we give great deference to its findings." (Internal quotation marks omitted.)

*Reiner, Reiner & Bendett, P.C.* v. *Cadle Co.*, 278 Conn. 92, 107, 897 A.2d 58 (2006).

There is sufficient evidence in the record to support the court's determination that the decedent lacked testamentary capacity on July 3, 2002. Tolsdorf testified that the decedent suffered from "significant dementia" and that she could not manage her affairs or her bills on her own. Tolsdorf's testimony also indicated that the decedent seemed confused about the distribution of her estate. Specifically, Tolsdorf testified that he asked the decedent "what her plans were regarding her bounty, and she said, well, all her three children were going to share in it equally, and then she indicated that the farm was going to go to one of the children, and I said, well, is the farm the biggest thing you own? And she said, yes, and I said, well, how are you then going to divide things equally if you give it all to one child? She didn't see a problem with that. She didn't understand why that would be difficult or problematic." Further, when asked if an individual suffering from dementia would have some days that were different from others, Tolsdorf responded that "[t]hat degree of variability shrinks as the dementia progresses, and the further along you get in the dementia, the less variability you're going to see on that. . . . But at the stage she was in, I think she was approaching that stage where the degree of day-to-day variability was already shrinking. I would not expect to see a lot of day-to-day variability with that." Tolsdorf further testified that "[i]t's my professional opinion that given the degree of her cognitive impairment, she would have not been able to fully understand the implications of what she was doing in terms of signing something like a will." When asked by the court if the decedent was incompetent on the day he examined her, Tolsdorf responded in the affirmative. Tolsdorf also testified that the decedent was likely

incompetent on July 3, 2002, as well, the day the second will was executed.

Furthermore, Louis Button, the attorney present at the will signing on July 3, 2002, also testified before the trial court. Button testified that he stopped the will signing "because I had an impression that there was some confusion on [the decedent's] part." Button testified that after halting the will signing, he spoke with another attorney in his firm to voice his concern about the decedent. The other attorney questioned the decedent about the will and apprised Button that he could have the decedent sign the will, which he did. On the basis of the foregoing, I cannot conclude that the court's determination, that the decedent lacked testamentary capacity when she executed a will on July 3, 2002, was clearly erroneous. I would therefore affirm the judgment of the trial court.

For the foregoing reasons, I respectfully dissent.

