******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

SHARON KUNZ *v.* DALE SYLVAIN ET AL.
(AC 36723)

Beach, Sheldon and Bear, Js.

Argued March 17—officially released September 15, 2015

(Appeal from Superior Court, judicial district of
Tolland, Cobb, J.)

*Martin B. Burke*, with whom were *Lara Sandberg*,
certified legal intern, and, on the brief, *Cheryl Povilonis*,
certified legal intern, for the appellant (plaintiff).

*James H. Howard*, for the appellees (defendants).

*Opinion*

BEACH, J. In 2005, Joel Sylvain amended his previous estate plan so that his plaintiff daughter, Sharon Kunz, was essentially disinherited. Joel Sylvain has since passed away, and the plaintiff claims that he lacked sufficient capacity to effect the changes. The trial court disagreed.

The plaintiff now appeals from the judgment of the trial court rendered in favor of the defendants, Dale Sylvain, individually and as trustee of a revocable living trust, and Kenneth Sylvain.[1] The plaintiff claims that the court erred in (1) concluding that Joel Sylvain, the settlor of the trust, had the requisite mental capacity to execute the challenged amendments to the trust, and (2) failing to shift the burden of persuasion to the defendants on her claim of undue influence. We affirm the judgment of the trial court.

The plaintiff instituted an action seeking to invalidate the 2005 amended inter vivos trust of Joel Sylvain, which removed her as a beneficiary, and to reinstate a 1996 trust, under the terms of which she was a beneficiary. In her complaint, she alleged lack of capacity and undue influence. The trial court found the following facts.[2] "Joel Sylvain had three children; Sharon Kunz . . . and Dale [Sylvain] and Kenneth Sylvain . . . . The defendant Hilda [Sylvain] was Joel [Sylvain's] second wife whom he married in 1993. Hilda [Sylvain] had previously been married to one of Joel [Sylvain's] ten siblings and had been an aunt to [the plaintiff and the defendants], prior to marrying Joel [Sylvain].

"On November 15, 1996, Joel [Sylvain] executed 'The Joel L. Sylvain Living Trust' (the 1996 Trust), for estate planning purposes. When he executed the 1996 Trust, Joel [Sylvain] was represented by the law firm Nirenstein, Horowitz and Associates in Hartford, which specialized in estate planning. The 1996 Trust consisted of approximately forty pages, and contained twelve articles, each containing a number of subsections. It named Joel Sylvain as trustor and trustee. Joel [Sylvain's] three grown children . . . were identified in the 1996 Trust. Section 4 named Hilda [Sylvain] and Dale Sylvain as 'Disability Trustees' and 'Death Trustees' in the event that Joel [Sylvain] became disabled or died. The 1996 Trust made specific distributions upon Joel [Sylvain's] death including giving all of his personal and real property to Hilda [Sylvain]. Under the 1996 Trust, Joel [Sylvain's] remaining property would be distributed equally among Joel [Sylvain's] three children, or if any of his children predeceased him, to their children.

The 1996 Trust was signed by Joel Sylvain as trustor and trustee. Both signatures were acknowledged by a notary public. Upon execution of the 1996 Trust, Joel [Sylvain's] assets were then transferred to the trust, which Joel [Sylvain] administered until he was deemed

disabled and placed in a nursing home in 2007. [The plaintiff does not claim] in this case that [the] 1996 Trust was invalid, or that Joel [Sylvain] lacked the requisite mental capacity to execute it.

"On August 22, 2005, Joel executed a restatement of the 1996 Trust, with certain amendments (the 2005 Trust). In executing the 2005 Trust, Joel [Sylvain] was represented by the same law firm that represented him in the execution of his 1996 Trust, and in particular, Attorney [Edward] Vinhateiro. Like the 1996 Trust, the 2005 Trust consisted of approximately forty pages and twelve articles, each with a number of subsections. The two documents contained essentially the same provisions except that the 2005 Trust contained two primary amendments: (1) to remove Hilda [Sylvain], who was 79, as one of the two death and disability trustees and to replace her with [the] defendant Kenneth [Sylvain]; and (2) to exclude [the plaintiff] as a beneficiary of the trust. Other minor changes were also made to the 2005 Trust document that made the document current with the law. In particular, as to the plaintiff, Section 7 of the 2005 Trust identified Joel [Sylvain's] three children, Dale [Sylvain], [the plaintiff] and Kenneth [Sylvain], but expressly and 'intentionally' excluded [the plaintiff] and her descendants 'from receipt of any portion of [his] Trust Estate.' The 2005 Trust, as amended, was signed by Joel Sylvain as trustee and trustor, and Joel [Sylvain's] signatures were acknowledged by a notary public and witnessed by Attorney Vinhateiro and his paralegal.

"As was his and his firm's practice, Attorney Vinhateiro spoke to Joel [Sylvain] alone, with a paralegal present, concerning the changes to his trust. Joel [Sylvain] told Attorney Vinhateiro that he wanted to exclude his daughter [the plaintiff] as a beneficiary of his trust estate, as well as to remove Hilda [Sylvain] as a death and disability trustee and [to] replace her with Kenneth [Sylvain]. Attorney Vinhateiro spent at least one hour with Joel [Sylvain] explaining and executing the necessary documents to accomplish Joel [Sylvain's] wishes. Attorney Vinhateiro had no concerns about Joel [Sylvain's] mental state or capacity at the time Joel [Sylvain] signed the documents, nor did he believe that Joel [Sylvain] was under any duress. Had he believed either to be true, he would not have gone forward with the amendments.

"In addition to executing the 2005 Trust on August 22, 2005, Joel [Sylvain] executed other legal documents designating his son Kenneth [Sylvain] as the conservator of his person and estate should he become incapable of managing his affairs, and naming Dale [Sylvain] as his power of attorney. He also executed a new will giving all of his property to his living trust as amended. These documents were properly witnessed and acknowledged. The witnesses to the 2005 last will and

designation of conservators for future incapacity expressly attested that Joel [Sylvain] signed those documents in their presence and that he was of sound mind, memory, and judgment and under no improper influence or restraint when he did so. With respect to the power of attorney document, two independent witnesses acknowledged that Joel [Sylvain] acknowledged that his action was 'a free act and deed.'

"Prior to amending his living trust, Joel [Sylvain] told Hilda [Sylvain] that he planned to take steps to remove her as a trustee upon his death or disability and exclude the plaintiff as a beneficiary. Hilda [Sylvain] had no concerns about being removed as a trustee, and as to Joel [Sylvain's] decision to exclude the plaintiff from benefiting from his estate, Hilda [Sylvain] told him: 'It's your money, do what you want.' Hilda [Sylvain] did not encourage or discourage Joel [Sylvain] from excluding the plaintiff from the 2005 Trust.

"Because Joel [Sylvain] could no longer drive, prior to August 22, 2005, he called Dale [Sylvain] and asked him to drive him to his attorneys' office in Hartford. Dale [Sylvain] agreed to drive his father to Hartford and did so on August 22, 2005. Dale [Sylvain] testified credibly that while he was with his father on August 22, 2005, Joel [Sylvain] was in good physical and mental condition, was walking on his own, and was not confused or otherwise showing signs of dementia. Dale [Sylvain] believed that Joel [Sylvain] knew the nature of his financial assets and his long-term health care policy, and that he knew Dale [Sylvain] and his other relatives. On the way to the law firm, Dale [Sylvain] asked Joel [Sylvain] why he was meeting with his attorney. Joel [Sylvain] responded: 'To clean up the mess [the plaintiff] made.'

"Upon arriving at the law firm, Dale [Sylvain] and Joel [Sylvain] were ushered into an office with Attorney Vinhateiro and his paralegal. Joel [Sylvain] said: 'I want to write my daughter out.' Dale [Sylvain] was then escorted out of the lawyer's office and did not see his father again until after the legal matters were completed. When Joel [Sylvain] came out of the lawyer's office, he said to Dale [Sylvain]: 'I fixed it, I wrote her out.' Prior to that time, Dale [Sylvain] had never suggested to his father that he remove the plaintiff as a beneficiary, and had never heard Hilda [Sylvain] or Kenneth [Sylvain] make that suggestion.

"As to his physical and mental health, beginning in the late 1990s, Joel [Sylvain] had a number of medical issues and was diagnosed with Parkinson's disease and later with Lewy Body Dementia, which is a type of dementia associated with Parkinson's disease. Both conditions were deemed progressive in nature. In 2005, Joel [Sylvain] had been diagnosed with mild to moderate dementia. As a result of these and his other physical conditions, Joel [Sylvain] had certain physical limita-

tions, which resulted in his inability to walk independently, write clearly, drive a car, or bathe or dress himself or manage his medications.

"In 2005, Joel [Sylvain] lived at home with Hilda [Sylvain], who cared for him. Medical records and firsthand accounts established that at times in 2005, as a result of his dementia, Joel [Sylvain] exhibited confusion, had memory lapses and hallucinations. His family testified that he had 'good days and bad days.' Throughout 2005, the credible evidence presented established that on his good days, Joel [Sylvain] knew his family members, including his three children, knew and understood his financial circumstances, was able to converse lucidly with his family members and read, understood and discussed television and newspapers stories and articles.

"Joel [Sylvain] was not isolated. He had visitors at his home, left his apartment for errands and meals with Hilda [Sylvain], had access to and spoke on the phone and attended adult day care, where [the plaintiff] visited him even after she was estranged from the family. He expressed his views, sometimes adamantly to his family members about financial and other matters, and the family followed his directives. Throughout this time period, Joel [Sylvain] managed and directed his own financial affairs, although he had assistance from Hilda [Sylvain] and Dale [Sylvain], and remained trustor and trustee of his 1996 Trust. He understood that his physical and mental health was deteriorating and took steps to ensure that his affairs were in order both as to his health care and finances, including executing a power of attorney and assigning a health care agent. Medical records from 2005 confirm and reveal that although he was exhibiting symptoms of dementia, including confusion, he was also alert and aware, as well as able to process and understand information.

"Joel [Sylvain's] decision to exclude [the plaintiff] from his 2005 Trust stemmed from a family dispute over Joel [Sylvain's] care and treatment, which pitted [the plaintiff] against the rest of the family, as well as [the plaintiff's] erratic behavior. Joel [Sylvain] had obtained a long-term health care policy which provided him approximately $500,000 in benefits. After Hilda [Sylvain] was hospitalized in early 2005, the three children became more involved in Joel [Sylvain's] care. At that time, [the plaintiff] owned a home health care agency, and provided a home health aide to care for Joel [Sylvain] during the day. The aide remained after Hilda [Sylvain] returned home from the hospital. The cost for these services was charged to and paid for by Joel [Sylvain's] long-term health care policy. In the spring of 2005, Joel [Sylvain] became concerned that too much money was being spent on the home health aide, which he did not believe he needed, and that the principal balance on his long-term health care policy was being reduced too quickly. A family meeting was held at Joel

[Sylvain's] residence to discuss the matter, during which [the plaintiff] became enraged and left.

"After the family meeting, Joel [Sylvain] decided to remove the plaintiff as his health care agent, and the services of her home nursing agency were terminated. The plaintiff then became estranged from the family, but would often call them, intoxicated and belligerent, resulting in calls by family members to the police. She also made a complaint to the state Department of Social Services asserting that Joel [Sylvain] was being neglected. Although [the plaintiff] did not visit her father at his home after the dispute, she did visit him at the adult day care facility, where he spent a significant amount of time.

"Eventually, in late 2006, Joel [Sylvain's] conditions worsened and he was moved to a nursing home, where Joel [Sylvain] understood that he would likely remain for the rest of his life. At that point, Joel [Sylvain] discussed with Dale [Sylvain] and [Kenneth Sylvain] distributions under the trust and told his sons he wanted Hilda [Sylvain] to receive a cash payout of $50,000, even though the trust did not provide for such a payment. The [defendants] abided by their father's wishes. Dale [Sylvain] and Kenneth [Sylvain] consulted with Joel [Sylvain's] attorneys and became the disability trustees under the 2005 Trust. Also with the assistance of Joel [Sylvain's] attorneys, Dale [Sylvain] and [Kenneth Sylvain] determined how much money would be needed to cover [their father's] health care needs during the remaining years of his life and those funds remained in the trust for that purpose. The remaining money, minus the $50,000 provided to Hilda [Sylvain], was distributed evenly between [the defendants]."

After a trial, the court found in favor of the defendants. This appeal followed.

I

The plaintiff claims that the court erred in concluding that the settlor, Joel Sylvain, had the requisite mental capacity to execute the 2005 trust amendments. We disagree.

In the first count of her complaint, the plaintiff alleged that Joel Sylvain suffered from physical and mental conditions that resulted in an inability to understand the nature and consequences of his decision to amend his living trust excluding the plaintiff as a beneficiary. The trial court found in favor of the defendants on this count. The court found that the credible evidence established that "in August, 2005, Joel [Sylvain] had the requisite mental capacity to amend his living trust to remove the plaintiff as a beneficiary." The court stated: "The parties agree that this is not a will contest, but a challenge to the validity of the 2005 trust, which is in the nature of a contract. Although the trust was a contract and not a will, the amendment at issue—essen-

tially disinheriting the plaintiff—was testamentary in nature. Neither the court nor the parties have located any Connecticut Supreme Court or Appellate Court cases on point concerning the proper capacity standard for the court to apply under such circumstances." The court concluded that under either standard, Joel Sylvain had the requisite mental capacity.

A

The plaintiff first argues that in analyzing Joel Sylvain's mental capacity to execute the 2005 trust amendments, the court erred by applying a testamentary standard rather than a contract standard in its evaluation of mental capacity. The plaintiff contends that the court erred in concluding that the 2005 trust amendments were "not particularly complex." This misperception, it is argued, led the court to apply a minimally exacting standard. The plaintiff argues that the mental capacity of a settlor of a complex trust ought to be evaluated by a more rigorous standard.

"[W]hether the court applied the correct legal standard is a question of law subject to plenary review. . . . The standard for testamentary capacity is well established. To make a valid will, the [testator] must have had mind and memory sound enough to know and understand the business upon which [he] was engaged, that of the execution of a will, at the very time [he] executed it. . . . The burden of proof in disputes over testamentary capacity is on the party claiming under the will. . . . While there is a presumption of sanity in the performance of legal acts, the party that presents a will still bears the burden of going forward with his proof, and only then does the burden shift to the opponents to prove incapacity.

"[A]n individual may possess the mental capacity necessary to make a will although incapable of transacting business generally. . . . Some courts have held the mental ability to execute a valid deed or contract to be the proper measure of testamentary capacity. . . . Others, that the possession of sufficient mind and memory for the transaction of ordinary business is the true test of capacity to make a valid will. . . . In this State one may make a valid will though mentally incapable of transacting business generally. . . . A will is not a contract. In evaluating mental capacity, the courts apply different standards for contracts and for testamentary instruments. The minimum level of mental capacity required to make a will is less than that necessary to make a contract or a deed . . . . Likewise, less mental capacity is required for the testator to make a will than to carry on business transactions generally, or ordinary business affairs. Thus, the ability to transact business is not a true test of testamentary capacity; the ability to transact complicated or important business, or even ordinary business, is not the legal standard of testamentary capacity. A person may execute a valid will, even

if he or she is not competent to transact ordinary, everyday affairs." (Citations omitted; internal quotation marks omitted.) *Deroy* v. *Estate of Baron*, 136 Conn. App. 123, 127–29, 43 A.3d 759 (2012).

In the circumstances of this case, we need not determine whether the more minimal level of testamentary capacity would have sufficed in the context of the change in estate plans executed in this case. Although the plaintiff argues that the court erred in determining that the trust was not complex, and, accordingly, that it need not apply a higher standard for mental capacity, the court in fact determined that under *either* standard, Joel Sylvain had the mental capacity to make the 2005 trust amendments. The court stated that it did "not have to decide what precise standard of capacity to apply . . . because it finds that the credible evidence adduced at trial clearly established that, under *either* standard, Joel [Sylvain] had the requisite mental capacity to understand the nature and consequences of his decision to amend his trust and to remove the plaintiff as a beneficiary. . . . Even under the higher standard for capacity, the court finds that Joel [Sylvain] had the requisite mental capacity to understand his decisions, and in particular, his decision to disinherit the plaintiff." (Emphasis added) The court determined, then, that even if it were to apply a standard requiring the ability to understand more complex transactions, it found that the plaintiff failed to prove her claim of lack of capacity. The court, in effect, applied the standard which the plaintiff now advocates.

The plaintiff argues, alternatively, that "[w]hile the court offers that Joel [Sylvain] would have had requisite capacity under either the testamentary or contractual standard, the court in its analysis *only applies testamentary principles*. The court cherry pick[ed] the testamentary features of the trust document and use[d] authority to support its position that only examine mental powers in relation to testamentary capacity." (Emphasis in original.) This assertion has little merit: the court clearly recognized that different mental capacities may be required for different sorts of transactions. The court appreciated the nature of the transaction in question and found that the settlor had a mental capacity adequate to understand and to effectuate that transaction. We will not search for an ambiguity. See *Brett Stone Painting & Maintenance*, *LLC* v. *New England Bank*, 143 Conn. App. 671, 681, 72 A.3d 1121 (2013) (We "do not presume error on the part of the trial court. . . . Rather, we presume that the trial court, in rendering its judgment . . . undertook the proper analysis of the law and the facts." [Citations omitted; internal quotation marks omitted.]).

### B

The plaintiff next claims, alternatively, that the court's factual finding that Joel Sylvain satisfied the

standard for mental capacity to understand the transactions in issue was clearly erroneous. We disagree.

The plaintiff argues that the trial court erred in not crediting the medical testimony that she had offered. The plaintiff argues that "[t]he court stated no reason why the expert witness testimony and evidence that it admitted was not considered in the decision. By stating that the only credible testimony pointed towards Joel Sylvain having sufficient mental capacity to amend the trust, the court implied that the plaintiff's experts were in fact not credible. . . . Given the plaintiff's experts' status as Joel Sylvain's treating physicians, as well as their credentials and character, the court had no basis by which to find that their testimony was not credible." The plaintiff further argues that Joel Sylvain's dementia was more profound on August 22, 2005, than the court found it to be, and that the court erred in crediting the testimony of lay witnesses to determine Joel Sylvain's mental and physical health.

One of the plaintiff's experts, Dr. Joy Antonelle deMarcaida, a movement disorder specialist in neurology, testified that it was "highly probable" that Joel Sylvain did not understand the nature and the extent of the changes he executed on August 22, 2005. She formed this opinion after examining Joel Sylvain in August, 2006, approximately one year after the execution of the trust amendments. Applying a regular rate of progression to his dementia, she offered her opinion as to Joel Sylvain's mental abilities in August, 2005. Another expert witness testifying on behalf of the plaintiff, Dr. John Schifferdecker, Joel Sylvain's primary care physician, examined Joel Sylvain approximately one month prior to the execution of the trust amendments. He testified that the trust was "quite lengthy and . . . quite detailed and I don't think he would be able to understand the whole thing in its entirety. He may be able to understand some of it."

Dr. Harry Morgan, a geriatric psychiatrist, testified on behalf of the defendants. He said that it was not possible for a medical professional accurately to opine about the mental capabilities of a person suffering from Lewy body disease and other problems such as those suffered by the decedent one year prior to the date of evaluation. He testified that Lewy body dementia is characterized by a general trend downward, but is "individual patient-specific" and that the individual could have a good month, then go downward, then do better and have another good month." He testified that "[i]t's like a wave with a general downward wave, but there are bumps along the way that make it a little harder to predict where somebody is from month to month." He stated that "Lewy body dementia is one of the harder illnesses to project backward in time."

Vinhateiro, the supervising attorney for the 2005 trust amendment, met with the decedent at the time the trust

documents were amended. He testified that he would not have proceeded if he thought that Joel Sylvain did not understand what he was doing and the nature and the disposition of his assets. Dale Sylvain testified that on August 22, 2005, his father telephoned him and asked him for a ride to the office of Nirenstein, Horowitz and Associates in Hartford. Dale Sylvain stated that when he asked his father why he was going to the law office, his father answered that he wanted "to clean up the mess that Sharon had made." He testified that during the August, 2005 time frame, his father would read the newspaper and talk about what he had read, that he could see, hear and talk and that on that day in particular his father was experiencing no hallucinations and did not exhibit mental confusion. He stated that upon entering the meeting room, his father stated, "I want to write my daughter out." He further testified that on the ride home, his father stated that he had "fixed it." A registered nurse at the adult day center attended by the decedent noted nine days after the amendments were executed that Joel Sylvain was communicative, alert, orientated, sociable and only occasionally forgetful.

The court found that: "The credible evidence produced at trial established that in the months both proceeding and following August 22, 2005, Joel [Sylvain] had good days and bad days. Although he had been diagnosed with dementia at that time, that alone is not sufficient to prove his incapacity. . . . Medical records and reports of Joel [Sylvain's] credible family members established that in the months immediately preceding and following the execution of the 2005 Trust, Joel [Sylvain] had good days during which he was alert, communicative, knew his family, understood his finances and was able to make decisions. Although he had dementia, the condition had not yet progressed to the point that he was fully incapacitated. Although Joel [Sylvain] needed significant assistance from his family, he was, for the most part, able to manage and direct his affairs. Moreover and importantly, on the day that he executed the 2005 Trust, Joel [Sylvain] had one of his good days. Firsthand accounts of Joel [Sylvain's] mental state on August 22, 2005, from his son and attorney, established that Joel [Sylvain] was not confused in any way and did not have any hallucinations or other signs of his dementia. Joel [Sylvain's] attorney met with him for an hour and went over the documents with him. Attorney Vinhateiro had no concerns about Joel [Sylvain's] ability to understand the nature, extent and consequences of his actions or decision to amend his trust. The signing of the 2005 Trust and other documents that day were properly notarized and witnessed by disinterested persons."

The court did not ignore medical testimony. It implicitly chose not to credit fully the testimony of the plaintiff's experts, as applied to the facts of this case. The

court implicitly credited the testimony of Morgan to the effect that Joel Sylvain had good and bad days in the time frame of August, 2005. There was additional evidence from Vinhateiro, Dale Sylvain and a registered nurse to support the court's finding that Joel Sylvain had the requisite mental capacity to amend his trust on August 22, 2005. These individuals observed Joel Sylvain during the time frame of the execution of the amendments. Lay witnesses are permitted to testify as to medical conditions that constitute "obvious or simple matters of everyday life . . . ." *State* v. *Orsini*, 155 Conn. 367, 372, 232 A.2d 907 (1967). See also *Sanzo's Appeal from Probate*, 133 Conn. App. 42, 49, 35 A.3d 302 (2012) ("case law supports the proposition that lay witnesses may testify as to a testatrix' mental condition").

The plaintiff's argument that the court should have credited the testimony of her experts rather than that of Morgan, Vinhateiro, and Dale Sylvain is unavailing. It is within the exclusive province of the trier of fact to resolve credibility issues. *McKeon* v. *Lennon*, 155 Conn. App. 423, 435, 109 A.3d 986 (2015). "Nothing in our law is more elementary than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded their testimony." (Internal quotation marks omitted.) *Schaffer* v. *Schaffer*, 187 Conn. 224, 227, 445 A.2d 589 (1982). "[I]t is well established that a reviewing court is not in the position to make credibility determinations. . . . This court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *Martinez* v. *Commissioner of Correction*, 147 Conn. App. 307, 312, 82 A.3d 666 (2013), cert. denied, 311 Conn. 917, 85 A.3d 652 (2014). There was evidence to support the court's findings as to mental capacity; its findings were not clearly erroneous.

II

The plaintiff finally claims that the court erred in denying her claim of undue influence. She claims that the burden of proof shifted to the defendants because of a fiduciary relationship between them and Joel Sylvain. We disagree.

The burden of proving undue influence rests ordinarily with the one asserting it. See *Bucchi* v. *Gleason*, 137 Conn. 25, 30, 74 A.2d 212 (1950). "It is the child's privilege to anticipate some share of the parent's estate. He may use all fair and honest methods to secure his parent's confidence and obtain a share of his bounty. From such a relationship alone, the law will never presume confidence has been abused and undue influence exercised. . . . The distinction between a legatee who is a child and one who is a stranger, being the religious

adviser, business agent, attorney, or physician of the testatrix, is marked. The law casts the burden of showing the absence of undue influence upon the legatee holding such fiduciary relation; otherwise the burden of proving undue influence remains with the party alleging it." (Citations omitted.) *Hills* v. *Hart*, 88 Conn. 394, 396, 91 A. 257 (1914). "If . . . a confidential relationship is proved, then the burden of proving fair dealing or the burden of showing the absence of undue influence shifts to the defendant or the fiduciary, and that burden must be sustained by clear and convincing evidence. . . . [If] such a fiduciary relationship was not established, the burden of proof . . . remained with the plaintiffs." (Citations omitted.) *Cooper* v. *Cavallaro*, 2 Conn. App. 622, 626, 481 A.2d 101 (1984).

We apply a plenary standard of review to the issue of whether the correct legal standard was used by the trial court. *Hartford Courant Co.* v. *Freedom of Information Commission*, 261 Conn. 86, 96–97, 801 A. 2d 759 (2002). "[W]hen the resolution of a question of law, such as the existence of a fiduciary duty, depends on underlying facts that are in dispute, that question becomes, in essence, a mixed question of fact and law. Thus, we review the subsidiary findings of historical fact, which constitute a recital of external events and the credibility of their narrators, for clear error, and engage in plenary review of the trial court's application of . . . legal standards . . . to the underlying historical facts." (Internal quotation marks omitted.) *Iacurci* v. *Sax*, 313 Conn. 786, 797 n.12, 99 A.3d 1145 (2014).

In her posttrial brief, the plaintiff argued that the defendants unduly influenced Joel Sylvain, causing him to execute the 2005 trust amendments. She further argued that, by exerting undue influence on Joel Sylvain, Dale Sylvain and Kenneth Sylvain breached fiduciary duties owed to Joel Sylvain as his attorneys-in-fact, and Dale Sylvain also breached the duty owed to his father as trustee. The plaintiff argued that, because the defendants breached a fiduciary duty owed to Joel Sylvain, the burden of persuasion shifted to the defendants.

The court determined that the plaintiff failed to present credible evidence to support her claim that Joel Sylvain's decision to remove her as a beneficiary resulted from the application of undue influence by the defendants and rejected her claim.[3] The court noted that the plaintiff cited no precedent to support her conclusion that a fiduciary relationship is established merely by virtue of being a beneficiary of a trust or a "disability or death trustee." The court concluded that the status of Dale Sylvain and Kenneth Sylvain as Joel Sylvain's attorney-in-fact and successor-attorney-in-fact, respectively, was not alone sufficient to shift the burden in these circumstances, particularly because there was no evidence that the defendants exercised

their power of attorney in relation to Joel Sylvain's decision to amend the trust in 2005. The court further found that neither Dale Sylvain nor Kenneth Sylvain was present in the room when Joel Sylvain executed the 2005 trust documents and that Joel Sylvain signed the 2005 trust documents as trustor and trustee. The attorney did not believe that Joel Sylvain was acting under any improper influence.

The plaintiff argues on appeal that the court erred in concluding that Dale Sylvain and Kenneth Sylvain did not owe a fiduciary duty to Joel Sylvain,[4] and accordingly, erred in declining to shift the burden. She contends that "[w]hile Dale [Sylvain] and Kenneth Sylvain happened to hold fiduciary roles as attorney-in-fact and conservator[5] leading up to and following the 2005 trust amendment, they were also considered fiduciaries by means of their close, trusting and controlling relationship with Joel Sylvain." The trial court found that neither Dale Sylvain nor Kenneth Sylvain exercised his power of attorney in relation to Joel Sylvain's decision to amend the 1996 trust, and that finding is not clearly erroneous. Joel Sylvain signed the 2005 trust amendments as settlor and trustee, and the court found that at the time of the execution of the 2005 trust amendments that Joel Sylvain was not subject to influence regarding his financial affairs and estate planning, but rather that he was headstrong and that his family took direction from him. The plaintiff has cited no authority for the proposition that an unused power of attorney creates a more general fiduciary duty as to all affairs. Furthermore, the plaintiff's argument regarding a fiduciary duty created by virtue of a parent-child relationship was neither addressed by the trial court nor correct. The existence of "a relation of personal confidence" between parent and child does not in itself raise a legal presumption of undue influence, nor does it shift the burden of proving undue influence to the opposing party. *Hills* v. *Hart*, supra, 88 Conn. 396.

On the basis of its factual findings, which are not clearly erroneous, the trial court correctly concluded that the execution of the trust amendments did not occur within either a formal fiduciary relationship, such as that of conservator-ward or trustee-beneficiary, or a more generalized fiduciary relationship, characterized by a justifiable trust on one side and resulting superiority and influence on the other. See *Ahern* v. *Kappalumakkel*, 97 Conn. App. 189, 194, 903 A.2d 266 (2006). Accordingly, the plaintiff cannot prevail on her claim that the court erred in declining to shift the burden of proving undue influence to the defendants.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Hilda Sylvain was also named as a defendant. Only Dale Sylvain and Kenneth Sylvain are involved in the present appeal, and thus the term "defendants" will refer to Dale Sylvain and Kenneth Sylvain only.

[2] We recite the court's findings of fact at some length because the trial

court's recitation, based on the evidence, aptly explains the controversy and provides factual support for its conclusions.

[3] The court concluded that Joel Sylvain had reasons to remove the plaintiff as a beneficiary of his estate. She was estranged from the family due to her disagreement with the rest of the family over Joel Sylvain's health care and her erratic and drunken behavior. The court determined that "Joel [Sylvain] was not a person subject to influence regarding his financial affairs and estate planning. From all accounts, Joel [Sylvain] was determined and headstrong, and if anything, his family took direction from him." Despite Joel Sylvain's medical conditions, "it was Joel [Sylvain] that was making decisions related to his health care, finances and estate planning, and the defendants who carried out his wishes. The defendants assisted Joel [Sylvain] by making deposits, writing checks, driving him places and took direction from him."

[4] The plaintiff's contention that she was harmed by a violation of a fiduciary relationship between Joel Sylvain on the one hand and Dale Sylvain and Kenneth Sylvain on the other is strained for several reasons. First, Dale Sylvain became a trustee of Joel Sylvain's trust approximately one year following the execution of the documents in question; he was not a trustee at the time the documents were executed and the plaintiff was "written out" of the documents. Although both Dale Sylvain and Joel Sylvain held powers of attorney at the time, the power of attorney had nothing directly to do with the execution of the documents in question.

[5] The trial court found that at the time of execution of the trust amendment, Joel Sylvain designated Kenneth Sylvain "as the conservator of his person and estate should he become incapable of managing his affairs, and nam[ed] Dale [Sylvain] as his power of attorney." There is no finding that anyone was a conservator at the time the amendment was executed.

_____