******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## APPENDIX

## ANDREW BASSFORD ET AL. *v.* FRANCES Z. BASSFORD*

Superior Court, Judicial District of Middlesex
File Nos. CV-15-6012903-S and CV-15-6013338-S

Memorandum filed March 24, 2016

*Proceedings*

Memorandum of decision on plaintiffs' appeals from orders of Probate Court for district of Middletown determining revocability of decedent's trust, title to certain real property and admitting decedent's will. *Appeals dismissed.*

*Carmine Perri* and *Taylor J. Equi,* for the plaintiffs.

*Joseph A. Hourihan,* for the defendant.

*Opinion*

HONORABLE BARBARA M. QUINN, JUDGE TRIAL REFEREE. In these two consolidated cases, the plaintiffs, Andrew and Jonathan Bassford and Zelda Alibzek, have appealed from the admission of their father's will to probate and from the revocation of a trust as well as the validity of a quitclaim deed thereafter executed by the trustees, all in furtherance of their father's estate plan. They claim that they are aggrieved parties and that: (1) the decedent, their father, Dr. William W. Bassford, lacked testamentary capacity at the time of the execution of his last will and testament; (2) a trust Dr. Bassford had earlier established was irrevocable, and therefore, its revocation was improper and of no effect. The trust assets could therefore not properly be conveyed and become part of the decedent's estate; (3) that the decedent lacked the capacity to accept the deed for property held in the purportedly irrevocable trust; (4) and there was undue influence exerted by the defendant, his surviving widow and their stepmother, in securing the execution of the new will. For the reasons set forth in detail below, the court finds all issues in favor of the defendant and dismisses these appeals.

## I

## BACKGROUND

From the reliable, probative and credible evidence, the court finds the following facts. The defendant, Dr. Bassford's widow, is his third wife and at the time of his death on February 19, 2014, Dr. and Mrs. Bassford had been married for thirty-three years. The defendant, Frances Bassford, became Dr. Bassford's conservatrix when he was involuntarily conserved in November 2011. Dr. Bassford's three children are his children from his first marriage, and by their conduct at trial, were not close to their stepmother. Dr. Bassford executed a will in 2006 in which the bulk of his estate was left to his three children. On May 7, 2012, he executed a new will in which he changed his estate plan to leave the bulk of his estate to his wife, with certain articles of personal property to two of his three children and some of his grandchildren, and one dollar to his son, Jonathan. The will of May 7, 2012, was duly admitted to probate, after findings made by Judge Marino that Dr. Bassford possessed sufficient testamentary capacity to execute the new will. He also found that the will was executed with the necessary statutory formalities. In addition, he determined that there was no evidence of undue influence by Frances Bassford, as claimed by Dr. Bassford's children. This appeal ensued.

Additionally, Dr. Bassford's children challenged the revocation of the trust established by Dr. Bassford as well as his acceptance of a deed to real estate from the trustees. Judge Marino held the trust to be revocable and that Dr. Bassford could receive the deed to the real

estate in Cromwell on which his home was located and in which he resided. An appeal was taken to the Superior Court and the two appeals are now consolidated.

## II

### JURISDICTION AND AGRRIEVEMENT

When considering an appeal from an order or decree of a Probate Court, the Superior Court takes the place of and sits as the court of probate. "In ruling on a probate appeal, the Superior Court exercises the powers, not of a constitutional court of general or common law jurisdiction, but of a Probate Court." (Internal quotation marks omitted.) *State* v. *Gordon*, 45 Conn. App. 490, 494, 696 A.2d 1034, cert. granted on other grounds, 243 Conn. 911, 701 A.2d 336 (1997) (appeal dismissed October 27, 1998).

The trial court does not have "subject matter jurisdiction to hear an appeal from probate unless the person seeking to be heard has standing. . . . In order for an appellant to have standing to appeal from an order or decree of the Probate Court, the appellant must be aggrieved by the court's decision. General Statutes § 45a-186 . . . . Aggrievement falls within two categories, classical and statutory. . . . Classical aggrievement exists where there is a possibility, as distinguished from a certainty, that a Probate Court decision has adversely affected a legally protected interest of the appellant in the estate. . . . Statutory aggrievement exists by legislative fiat which grants an appellant standing by virtue of particular legislation, rather than by judicial analysis of the particular facts of the case. . . . It merely requires a claim of injury to an interest that is protected by statute." (Citations omitted; internal quotation marks omitted.) *Kucej* v. *Kucej*, 34 Conn. App. 579, 581–82, 642 A.2d 81 (1994), overruled in part on other grounds by *Heussner* v. *Hayes*, 289 Conn. 795, 807, 961 A.2d 365 (2008); see also *Marchentini* v. *Brittany Farms Health Center, Inc.*, 84 Conn. App. 486, 490, 854 A.2d 40 (2004).

In this instance, Dr. Bassford's three children would have received a different and greater portion of their father's estate had the Probate Court ruled in their favor. By its contrary ruling, each of Dr. Bassford's children is classically aggrieved. They each have standing to prosecute these appeals and the court has jurisdiction to hear these appeals.

## III

### FACTS AND DISCUSSION

#### A

#### Burdens of Proof, Due Execution of Will And Testamentary Capacity

Our law provides that "[a]n appeal from probate is not so much an appeal as a trial de novo with the

Superior Court sitting as a Probate Court and restricted by a Probate Court's jurisdictional limitations. . . . At the trial de novo, a will's proponent retains the burden of proving, by a preponderance of the evidence, that the will was executed in the manner required by statute. . . . The proponent must prove anew that the will's execution was in compliance with the statute in effect at the time it was executed. . . . To be valid, [a] will must comply strictly with the requirements of [the] statute. . . . Because the offer for probate of a putative will is in essence a proceeding *in rem* the object of which is a decree establishing a will's validity against all the world . . . the proponent must at least make out a *prima facie* case that all statutory criteria have been satisfied even when compliance with those criteria has not been contested." (Citations omitted; emphasis added; internal quotation marks omitted.) *Gardner* v. *Balboni*, 218 Conn. 220, 225–26, 588 A.2d 634 (1991).

In this case, the proponent of the will is the defendant, Mrs. Bassford. Connecticut General Statutes § 45a-251 governs the proper execution of a will and provides in pertinent part: "A will or codicil shall not be valid to pass any property unless it is in writing, subscribed by the testator and attested by two witnesses, each of them subscribing in the testator's presence . . . ." The facts demonstrate unequivocally that Dr. Bassford's attorney, Attorney Annette V. Willis, brought two witnesses into the home and Dr. Bassford signed the will in their presence. While on some points the witnesses' subsequent testimony by way of deposition transcripts reflects their lack of detailed recall, such testimony is inadequate to overcome both Attorney Willis' direct testimony to the events of that day as well as the contents of their sworn affidavit on the bottom of the will that they state under oath that they: "attested the within and foregoing Will . . . and subscribed the same in his presence and at his request and in the presence of each other; that the said Testator signed, published and declare the said Instrument as and for his Last Will and Testament in our presence on this 7th day of May, 2012; and at the time of the execution of said Will said Testator was more than eighteen years of age, was able to understand the nature and consequences of the document and was under no improper influence or restraint to the best of our knowledge and belief . . . ."[1]

Contrary to Plaintiffs' arguments, the will was properly executed in accordance with the statutory requirements. The court finds, from the relevant and probative evidence, that the defendant has met her burden of proof of the due execution of the will.

The proper execution of Dr. Bassford's will is only the first of the plaintiffs' several challenges to the will's effectiveness and admission to probate. The major issue in this appeal is Dr. Bassford's capacity to make a will. General Statutes § 45a-250 provides that: "Any person

eighteen years of age or older, and of sound mind, may dispose of his estate by will." "The burden of proof in disputes over testamentary capacity is on the party claiming under the will." *Stanton* v. *Grigley*, 177 Conn. 558, 564, 418 A.2d 923 (1979). The defendant in this case has this burden as well.

"What constitutes testamentary capacity is a question of law. . . . To make a valid will, the testatrix must have had mind and memory sound enough to know and understand the business upon which she was engaged, that of the execution of the will, at the very time she executed it. . . . Whether she measured up to this test is a question of fact for the trier." (Citations omitted.) *City National Bank Trust Co.'s Appeal*, 145 Conn. 518, 521, 144 A.2d 338 (1958).

Our law provides that it is a testator's capacity at the time of the will execution that is relevant. "The fundamental test of the testatrix's capacity to make a will is her condition of mind and memory at the very time when she executed the instrument. . . . While in determining the question as to the mental capacity of a testator evidence is received of his conduct and condition prior and subsequent to the point of time when it is executed, it is so admitted solely for such light as it may afford as to his capacity at that point of time and diminishes in weight as time lengthens in each direction from that point." (Citations omitted.) *Jackson* v. *Waller*, 126 Conn. 294, 301, 10 A.2d 763 (1940).[2]

The decedent, Dr. Bassford, as the medical evidence and other testimony demonstrates, was a person who suffered from severe anxiety and depression as well as post-traumatic stress disorder from his service in World War II. None of the parties dispute that he suffered from some mild to moderate dementia, had impaired hearing and was susceptible to frequent urinary tract infections from his Foley catheter, which had been in place for over nineteen years at the time of his death. Due to the drug treatment Dr. Bassford received for anxiety, he became dependent on benzodiazepine, specifically Lorazepam.[3] The use of this drug is known to cause some impairment of general cognitive function, as well. When he suffered from urinary tract infections, he would become delirious and require hospitalization. Treatment with antibiotics stabilized him quickly and he returned to his former functioning state.

Dr. Bassford became concerned about the distribution of his monthly Veterans Administration pension payments and his estate in 2011. The defendant in these appeals, Mrs. Bassford, then commenced an involuntary conservatorship proceeding to have Dr. Bassford conserved. Attorney Willis was appointed to represent Dr. Bassford in October, 2011, by the Probate Court. She had not met him prior to her appointment by the court.

From Attorney Willis' testimony, the court finds that

in October of 2011, when she met him, Dr. Bassford was eloquent, well-spoken and coherent. He was oriented as to place and time. He was upset that his pension payments were going to his children. He was able to ask relevant and reasonable questions about the conservatorship. The court finds that Dr. Bassford was informed about the types of conservatorship possible, voluntary and involuntary. His counsel affirmed she was aware that he had memory deficits and anxiety and did not like to leave his home. Nonetheless, he was clear he wanted his wife to have full authority over his affairs and to help him secure his pension payments. When his counsel met with Dr. Bassford, after the preliminary social niceties, she met alone with Dr. Bassford. The defendant did not participate in the discussions and was not in the room when Attorney Willis and Dr. Bassford discussed his legal affairs and his pension payments.

Andrew Bassford testified to the fact that his father, at the time the veteran's pension benefits had earlier commenced, wanted his children to receive those benefits as they came from a time when he had not yet married the present Mrs. Bassford. There was some indication that at the commencement of the payments, they were deposited into Dr. Bassford's bank accounts and then distributed to his children. By 2011, these benefits were being deposited into accounts no longer under Dr. Bassford's control.

At the time of the conservatorship, the court finds, such distributions were no longer what he desired. Even if, as the plaintiffs claim, there was tension between the family members and between Dr. Bassford and his wife,[4] there was ample opportunity for him to request different actions from his attorney, during their private meetings. He never did so, despite having multiple appointments with her. He emphasized how upset he was with his son, Jonathan, and his conduct. From this, the court finds, that his wishes at the time in question were as stated to his attorney. He wanted his veteran's pension to be paid into his own accounts for his use. In due course, the pension payments were rerouted from Dr. Bassford's children to Dr. Bassford's accounts.

During the time of the proceedings leading up to the conservatorship, Dr. Bassford informed Attorney Willis about his desire to change his will and the distribution of his estate. Once the conservatorship was completed, and over the course of the next several months after the conservatorship was granted, Attorney Willis began her work to carry out his wishes. There were at least three meetings for his lawyer to go over his estate plan and conduct a detailed review of his assets with him. It was during this time that Attorney Willis came to understand that there was a trust containing his interest in the home in which the Bassfords resided in addition to a retirement account. Dr. Bassford's statements of

his wishes regarding his estate remained consistent over these months and at each meeting with Attorney Willis. He never wavered or was confused about his desires. He was focused on adequately providing for his wife.

Dr. Bassford and Attorney Willis had a meeting in March, 2012, in his home. She spoke with him in detail about his assets and what he wanted to happen in his will and his general estate plan. At that time and earlier, he was and had been insistent that his son Jonathan only receive one dollar. Dr. Bassford wanted his treasured antiques to go to his other two children and some of his grandchildren. Subsequently, after the March appointment, Dr. Bassford and Mrs. Bassford prepared a list of those items of personal property, as Dr. Bassford's handwriting was a bit shaky. Attorney Willis reviewed that list with him in detail and had him sign it at their next meeting on April 26, 2012. The list[5] clearly specifies what is to be distributed and to whom and the last page is in his handwriting. In addition, on that day Dr. Bassford wrote out and signed a note indicating he only wished his son Jonathan to receive one dollar upon his death.[6] The court finds that the list and note represented Dr. Bassford's personal wishes.

Next, Dr. Bassford's general mental condition was evaluated, at Attorney Willis' request, by a psychiatrist, Dr. Jay A. Lasser, who subsequently issued a report and testified at the probate hearing as well as at trial. Dr. Lasser met with Dr. Bassford on April 26, 2012, and conducted a formal clinical interview. He previously had access to and had reviewed Dr. Bassford's extensive medical history. He confirmed that Dr. Bassford had dementia, which was a slowly progressive and ongoing condition. He found Dr. Bassford to have memory deficits and, determined from recent medical records, that he had had episodes of delirium when he had urinary tract infections.[7] Dr. Lasser found that when Dr. Bassford's infections were treated, he returned to lucidity quickly. He found the episodes of infection-induced delirium had no residual impact on his baseline cognitive level, which he admitted was impaired. He agreed that Dr. Bassford's functioning fluctuated significantly from time to time, but that when he was well and not in the throes of an infection, he functioned at a stable level. In his professional psychiatric opinion, Dr. Bassford possessed the cognitive ability to know the nature and extent of his assets and what he wanted to have done with them.

On May 7, 2012, Dr. Bassford met with his counsel, Attorney Willis, and reviewed his will, the list of personal property contained within the will, his decision to leave his son Jonathan only one dollar and the other details of his will. He also reviewed his health care directive and independently noted some errors when it was presented to him. He corrected those errors him-

self, and initialed them. He then signed his will and the directive in front of two witnesses and Attorney Willis took his acknowledgment and signed the self-proving affidavit of the witnesses. From Attorney Willis' testimony, the court finds that he was functioning at his normal level on that day, that he was well-spoken, lucid and aware of the time and place. He understood her questions and directions. He knew the nature and extent of his estate and how he wanted it distributed. Those statements and wishes were consistent with those he had expressed in the months leading up to the execution of his last will and testament.

Plaintiffs called a psychiatric expert, Dr. Harry E. Morgan, who reviewed Dr. Bassford's extensive multiyear medical records, but did not meet with him personally. In general, his opinion was that Dr. Bassford did not have sufficient capacity to execute a will. He particularly focused on the impairments to his executive functions and the tests which demonstrated his deficits. Dr. Morgan's expert testimony, despite his evident expertise, is not persuasive on this conclusion, the court finds, based both on his lack of opportunity to personally observe Dr. Bassford and his testimony about the actions Dr. Bassford took on the day of the will execution. Dr. Morgan admitted that, if Dr. Bassford was able to make independent, unsolicited corrections to a legal document on the day of his will execution, then at that time, he possessed sufficient mental capacity to execute his will. The court has specifically found that he made such independent corrections to his health care directive on that day. Attorney Willis' testimony and the document reflect those independently made corrections.[8] Dr. Morgan's admissions are further evidence and support for the conclusion that Dr. Bassford knew and understood what he was about at the time he signed the will on May 7, 2012. The court finds, from all of the evidence, that Dr. Bassford, on May 7, 2012, had the requisite mental capacity to understand what he was signing. He knew the nature and extent of his estate and how he wanted his last will and testament to distribute that estate upon his death.

### B

### Nature of Trust and Its Revocation, Mental Capacity to Revoke

### 1

### Nature of Trust and Revocation

The next legal task to be completed on Dr. Bassford's behalf was the revocation of the trust Dr. Bassford had established, so that terms of his estate plan, as he had outlined those wishes to Attorney Willis, could be accomplished. Plaintiffs first claim that it was not a revocable trust. Dr. Bassford established a trust on July 7, 2006 labeled the "William W. Bassford Irrevocable Trust." That trust, however, contained an Article Two,

which specifically states that: "[n]otwithstanding anything herein contained, the Settlor explicitly reserves the following powers . . . 5. [t]o revoke this trust . . . ." While the plaintiffs argue that the title of the trust should control, rules of the construction of contracts indicate otherwise.

In general, it is hornbook law that where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. "[W]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 495, 746 A.2d 1277 (2000). "[T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) Id., 498.

In this trust, there is a conflict between the label used in the title "Irrevocable" and the direct provisions in Article Two. The rule has long been established that: "If the recitals are clear and the operative part is ambiguous, the recitals govern the construction. If the recitals are ambiguous, and the operative part is clear, the operative part must prevail. If both the recitals and the operative part are clear, but they are inconsistent with each other, the operative part is to be preferred." (Internal quotation marks omitted.) *Wilson* v. *Towers*, 55 F.2d 199, 200 (4th Cir. 1932).

The plaintiffs argue that the recital, that is to say the word "Irrevocable" in the title of this trust, should control. Such a construction would defeat the more detailed and operative terms of Article Two and therefore, the court finds, that the more detailed provisions more consistently carry out the settlor's intent and wishes, namely that he should be able to revoke the trust at his discretion. The court interprets and construes the trust to effectuate that intent and finds that it is a revocable trust.[9]

2

### Mental Capacity to Revoke Trust

Next, plaintiffs challenge Dr. Bassford's mental capacity to revoke the trust. While separate from the issue of testamentary capacity, these claims raise simi-

lar issues, although on such claims the plaintiffs have the burden of proof. The law on taking any action with respect to a trust requires the individual taking such action to have the mental capacity to undertake business. Such action requires a greater capacity than the ability to make a will. As noted in *Kunz* v. *Sylvain*, 159 Conn. App. 730, 123 A.3d 1267 (2015), a case with many similarities to the present case, there were two different standards for signing a will and taking action with respect to a trust. *Kunz* quoted *Deroy* v. *Estate of Baron*, 136 Conn. App. 123, 127, 129, 43 A.3d 759 (2012), that a person may have the mental capacity necessary to make a will although incapable of transacting business generally. See also *Turner's Appeal*, 72 Conn. 305, 44 A. 310 (1899). In *Kunz*, the court reviewed the task required of the settlor of the trust in amending it and found it was a simple matter. It held that the requisite mental capacity under the higher standard had been established.

A review of the relevant facts reveals that on June 14, 2012, Dr. Bassford was psychiatrically hospitalized at the Institute of Living. He was feeling more "anxious and more depressed over the past few weeks prior to admission" and "stated he was experiencing suicidal ideations."[10] The discharge note goes on to say that during the course of his stay, "[t]he patient was alert and oriented x3, but sometimes would become easily confused with multiple stressors and multiple parts of information."[11]

When Attorney Willis came to visit Dr. Bassford at the Institute, she brought her husband with her as a witness. She testified that, on that day, she had a question and answer session with Dr. Bassford that lasted approximately twenty minutes. He was alert and not confused. She had advised Dr. Bassford that execution of the trust revocation awaited his discharge. Nonetheless, Dr. Bassford wanted to proceed and put the whole matter behind him as he knew that the will would not have the effect he intended without the revocation. He instructed her to proceed, despite her cautions. She recalled that she had reviewed the trust terms with him from memory and certainly the right to revoke the trust. On June 20, 2012, Dr. Bassford signed the revocation as well as his wife, Frances Bassford. Attorney Willis took their acknowledgments. Mrs. Bassford also testified to his functioning on that day and confirmed Attorney Willis' account of Dr. Bassford's lucidity.

The court finds that Dr. Bassford was functioning at his normal level on that day, and understood what he was about. The plaintiffs argue and stress that Dr. Bassford was not capable of making such a decision with the level of cognition and understanding required. Dr. Morgan, the plaintiffs' expert had testified that Dr. Bassford had ever increasing dementia and impairment of his executive functions, as well as acalculia, the inability

to deal with numbers involving even a moderate level of complexity. And the Institute of Living discharge note of July 3, 2012, also talks about Dr. Bassford's rising levels of confusion with "multiple stressors and multiple parts of information."[12]

Nonetheless, the court finds that the task required of Dr. Bassford on that day in June, 2012, had been discussed and contemplated by him over the course of more than three months and his desire to complete his estate plan had not wavered or changed in any way. There were not "multiple stressors or multiple parts of information" for him to process with respect to the revocation of his trust. This was a simple task which did not require complex or interrelated decisions or numerical calculations. He simply needed to indicate his desire to revoke his trust. There were no facts in support of a finding that Dr. Bassford was confused about what was happening.

Plaintiffs stress that Attorney Willis failed to review with Dr. Bassford all relevant terms of the trust or bring the trust with her on that day. Specifically, they cite the need to review with him Articles Two, Three, Four and Thirteen.[13] The court begs to differ. All Dr. Bassford needed to know was his lawyer's opinion and her basis for concluding that the trust was revocable and what was necessary for him to do; that is as settlor, state his reasons for revoking the trust, revoke the trust and also request that his trustees take such action. As *Kunz* v. *Sylvain*, supra, 159 Conn. App. 730, suggests, the complexity of the task at hand is of relevance in the determination about a person's required level of functioning. On June 20, 2012, it is apparent, and the court finds, that Dr. Bassford clearly understood what was required and what task he was undertaking. It was a simple matter. He was not confused or uncertain but had been independently determined, even while so hospitalized, to proceed with this action and complete his estate plan. The court finds he had the greater mental capacity legally required to undertake this transaction.

The last steps to complete the transaction were required of Dr. Bassford's trustees. His trustees, William Long and Henry L. Long, Jr., were two longtime friends of Dr. Bassford's from his childhood.[14] Dr. Bassford had earlier requested that his counsel contact them about his wishes. This Attorney Willis accomplished by letter and the Long brothers visited Dr. Bassford while he remained at the Institute of Living. Each of them stated that Dr. Bassford appeared his normal self and was able to carry on a conversation with them. According to Henry Long, Jr., when Dr. Bassford said what he wanted, he was going to do it, as this was his best friend. William Long testified, when questioned about the detailed recitals in the revocation instrument, he did not now recall, but that he would not have signed the document if the statements were not true. The recit-

als in the instrument are that Dr. Bassford requested the revocation of the trust, that he wished the real property contained in the trust to be reconveyed to him, that the Longs had personally conferred with Dr. Bassford and that they had read Dr. Lasser's report concerning Dr. Bassford's capacity to make a new will.[15] At trial in December, 2015, Henry Long recalled the letter sent to him by Attorney Willis and that it contained other information which he believed he must have read.[16] They subsequently signed the trust revocation some days after their visit with Dr. Bassford.

From the testimony of the Long brothers, Attorney Willis' testimony, the simple nature of the actions required, Dr. Bassford's awareness of the important connection of this document to his estate, as well as his sense of urgency on June 20, 2012, the court finds that Dr. Bassford had the requisite mental capacity to properly revoke the trust he had established in 2006. The plaintiffs' claims must fail, as they have not met their burden of proof.

### C

### Ability to Accept Deed

There remains the issue of Dr. Bassford's status as a conserved person, which implicates his ability to accept the deed from his trustees conveying the revoked trust's interest in the real estate to him. As a preliminary matter, it is interesting to note that the probate decision by Judge Marino of November 21, 2014, holds that the involuntary conservatorship did not remove Dr. Bassford's right to take action with respect to his trust or to accept title to real estate.[17] Specifically, he stated that the issue of "Dr. Bassford's capacity to authorize revocation of the Trust and to accept a conveyance of property from the Trust is covered by [§] 45a-650 [(c)] of the Connecticut General Statutes. 'A conserved person shall retain all rights and authority not expressly assigned to the conservator.' " Those rights, he notes, were not specifically assigned to the conservator. The court agrees and finds that Dr. Bassford retained such rights and could, despite being a conserved person, request that the trustees revoke the trust and revoke it himself. Further, he could request they convey real estate to him.

Plaintiffs cite Connecticut General Statutes § 45a-653 in support of their proposition that Dr. Bassford could not accept the real property conveyed to him. The court finds this statutory section to be inapposite since it concerns conveyances of property by the proposed conserved or conserved person, not the situation before the court. The public policy of this statute is to protect a conserved person from depleting his or her assets, not adding to them, as results from the acceptance of a deed to property. Certainly, the specific right for trustees to convey property is set forth in the Connecti-

cut Fiduciary Powers Act, General Statutes § 45a-234 (2). The court concludes there is no prohibition against a conserved person receiving title to real property from another source. Plaintiffs have not prevailed on this claim.

## 4

### Undue Influence

Plaintiffs also claim that the defendant exerted undue influence in getting Dr. Bassford to sign a will leaving the bulk of his estate to her. The burden of proof on this issue remains with the plaintiffs. The law provides that:

"Undue influence is the exercise of sufficient control over a person, whose acts are brought into question, in an attempt to destroy his [or her] free agency and constrain him [or her] to do something other than he [or she] would do under normal control. . . . It is stated generally that there are four elements of undue influence:

"(1) a person who is subject to influence;

"(2) an opportunity to exert undue influence;

"(3) a disposition to exert undue influence; and

"(4) a result indicating undue influence. . . .

"Relevant factors include age and physical and mental condition of the one alleged to have been influenced, whether he [or she] had independent or disinterested advice in the transaction . . . consideration or lack or inadequacy thereof for any contract made, necessities and distress of the person alleged to have been influenced, his [other] predisposition to make the transfer in question, the extent of the transfer in relation to his [or her] whole worth . . . failure to provide for all of his [or her] children in case of a transfer to one of them, active solicitations and persuasions by the other party, and the relationship of the parties." (Citations omitted; internal quotation marks omitted.) *Pickman* v. *Pickman*, 6 Conn. App. 271, 275–76, 505 A.2d 4 (1986). See also *Lee* v. *Horrigan*, 140 Conn. 232, 237, 98 A.2d 909 (1953).

While it is true that Mrs. Bassford was Dr. Bassford's conservatrix, it has not been demonstrated that Dr. Bassford was a person subject to such influence nor susceptible to it. While Mrs. Bassford was in a position to exert such influence, the testimony of Attorney Willis and her independent observations of Dr. Bassford demonstrate that such influence was not exerted. Dr. Lasser also testified to the fact that Dr. Bassford was aware of his situation and clear about his wishes. There is no direct evidence of undue influence, and to the extent it may exist, it is inferential in nature; merely by the position of these parties as husband and wife in the twilight of their lives.

Direct evidence of undue influence is often not avail-

able and is not indispensable. See *Salvatore* v. *Hayden*, 144 Conn. 437, 440, 133 A.2d 622 (1957). But the mere opportunity to exert undue influence is not alone sufficient. There must be proof not only of undue influence but that its operative effect was to cause the testator to make a will which did not express his actual testamentary desires. *Hills* v. *Hart*, 88 Conn. 394, 402, 91 A. 257 (1914). On all these points, the plaintiffs have failed to meet their burden of proof. There simply is no evidence. Their suspicions alone are not enough. On this claim, the court also finds for the defendant.

## ORDERS

For all of the foregoing reasons, the plaintiffs' claims fail and the appeals are dismissed.

* Affirmed. *Bassford* v. *Bassford*, 180 Conn. App. 331,    A.3d    (2018).

[1] Exhibit A and Exhibit 71, copies of Dr. Bassford's Last Will and Testament, dated May 7, 2012.

[2] It is for these legal reasons, that most of Dr. Bassford's medical records dating from 2006 through 2011 are not highly relevant to the issue of his testamentary capacity on May 7, 2012. They are all simply too remote in time.

[3] Many exhibits concerning Dr. Bassford's medical condition were introduced, which detailed his various conditions including his medication history, starting from 2006 forward. Those records reflect that on a number of occasions, his doctors attempted to reduce his Lorazepam dosage and dependence, with resulting significant increases in his anxiety levels. Each such attempt ended when his treaters reluctantly acquiesced in his use of this drug at the dosages required to keep him calm and stable.

[4] The plaintiffs point to multiple medical records documenting such tension during times of medical stress, delirium and disorientation, as though such reports were the only correct and "true" evidence of Dr. Bassford's desires. They ignore and choose to discount all independent evidence of Dr. Bassford's expression of his desires on multiple occasions when he was alert and functioning well. Logically, they cannot have the evidence to support two such inconsistent notions, correct for purposes of demonstrating undue influence and that his "true desires" were not to benefit his wife, and on the other hand, that such delirium and reduced functioning is evidence of his lack of testamentary capacity and capacity to revoke his trust.

[5] See Exhibit 34, signed on April 26, 2012.

[6] Exhibit 62, dated April 26, 2012.

[7] While plaintiffs make much of the differences of opinion between the two experts, Dr. Jay A. Lasser and Dr. Harry E. Morgan, about the meaning of the word "pseudo-dementia," the court finds the insistence on one expert's definition over the other to have no particular weight in these proceedings. An expert is entitled to his definition as he uses it and it is that expert's use of the term that controls.

[8] See notations on Exhibit D, with Dr. Bassford's initials on all the corrections.

[9] The court has reviewed and notes the cases and statutes on which the plaintiffs rely in support of their argument that this is an irrevocable trust. Having determined the trust is revocable, the court does not review such cases and law further.

[10] Exhibit 93, Discharge Summary, Institute of Living, July 3, 2012, page 1.

[11] Ibid., page 2.

[12] Exhibit 93, Discharge note of July 3, 2012, Institute of Living, page 1.

[13] See Exhibit 10 and the relevant articles set forth therein.

[14] Each of them testified that they had known Dr. Bassford for more than eighty years.

[15] See Exhibit 89, signed by the Longs on June 25, 2012, before a notary.

[16] Exhibit 75, Letter dated May 18, 2012, which contains the information referenced sent by Attorney Willis to Henry and William Long.

[17] Both Probate Court decisions are attached to the respective complaints filed by the plaintiffs in these appeals, and as such, are judicial admissions.