******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## MICHAEL BARTUNEK ET AL. *v.*
## RUDOLPH BARTUNEK ET AL.
## (AC 47255)

Elgo, Suarez and Westbrook, Js.

*Syllabus*

The defendants appealed from the Superior Court's judgment for the plaintiffs in their action appealing a decree of the Probate Court that admitted a 2016 will of the decedent to probate. The defendants claimed, inter alia, that the Superior Court improperly determined that the decedent lacked testamentary capacity with respect to the 2016 will. *Held*:

The Superior Court's finding that the decedent lacked testamentary capacity when he executed the 2016 will was not clearly erroneous, as there was sufficient evidence in the record to support the Superior Court's factual findings and this court was not left with the definite and firm conviction that a mistake had been made.

The Superior Court's factual findings in support of its conclusion that the decedent had been unduly influenced in the making of the 2016 will were not clearly erroneous, as it properly determined that each element of undue influence had been met after considering the testimony of the witnesses and the distinct differences between the 2016 will and the decedent's prior will and the court's conclusion was supported by significant evidence in the record.

Argued September 15, 2025—officially released April 7, 2026

*Procedural History*

Appeal from the decree of the Probate Court for the district of Region 14 admitting a certain will of Thomas Bartunek to probate, brought to the Superior Court in the judicial district of Hartford, where Steven Bartunek, the administrator of the estate of the plaintiff David Bartunek, was substituted as a party plaintiff; thereafter, the case was tried to the court, *S. Connors, J.*; judgment for the plaintiffs, from which the defendants appealed to this court. *Affirmed*.

*Corinne A. Burlingham*, with whom were *Brendon P. Levesque* and, on the brief, *Eric P. Anderson*, for the appellants (defendants).

*C. Michael Budlong*, with whom was *Ian Majka-Sunde*, law student intern, for the appellees (named plaintiff et al.).

*Opinion*

WESTBROOK, J. The defendants, Rudolph Bartunek and Michelle Bartunek, appeal from the judgment of the Superior Court setting aside a decree of the Probate Court admitting and upholding the last will and testament of the decedent, Thomas Bartunek, dated June 27, 2016 (2016 will).[1] On appeal, the defendants claim that the court improperly determined that **(1)** Thomas lacked testamentary capacity with respect to the 2016 will and **(2)** the 2016 will was the product of undue influence on Thomas by the defendants. We reject the defendants' claims and affirm the judgment of the court.

The following facts and procedural history, as found by the Superior Court and supported by the record, are relevant to this appeal. The original plaintiffs were David Bartunek and Michael Bartunek.[2] David is the son of Thomas and his wife, Anna Bartunek. Michael is David's son and the grandson of Thomas and Anna. Thomas and Anna were married for more than fifty years and, since at least 1978, lived in a residence at 74 Jones Hill Road in East Haddam. Their property bordered property owned by Rudolph, Thomas' brother, who resided therein. Although the brothers lived adjacent to one another for decades, they and their families had very little interaction with one another. But for this litigation the parties would not even know one another. Rudolph's daughter, Michelle, had virtually no interaction with her uncle or his family. Although her father's home was no more than two to three minutes away from Thomas' home, in her roughly twenty years of living there, she was not aware of anyone else living with Thomas other than Anna. Michelle saw David once or twice as a child.

---

[1] Because the parties and other relevant individuals share the same last name, for clarity we will refer to these individuals in subsequent references by their first names.

[2] David died during the pendency of the proceedings. Steven Bartunek, David's son and the administrator of his estate, was later substituted as a plaintiff. We refer to David and Michael collectively as the original plaintiffs and to Michael and Steven collectively as the plaintiffs throughout this opinion.

She occasionally saw Thomas in the yard tending to his animals but saw Anna less often. As David began having children, Michelle still had no interaction with her uncle's family. The two families did not dine together, nor did they attend one another's family functions except for an occasion, approximately thirty years ago, when Thomas and Anna attended the wedding of one of Rudolph's daughters. Throughout the entirety of Michelle's adult life, the only interaction she saw between her father and Thomas, before Anna died, was when the two would hay their respective fields and shear their respective sheep.

Thomas and Anna had tremendous love for each other and for their animals, which they expressed in their 2011 reciprocal wills, which were prepared by Attorney Daniel Ryan. Thomas' 2011 will (2011 will) bequeathed 50 percent of his estate to the Anna and Tom Bartunek Animal Fund. The remaining 50 percent was to be divided among David and his children. All parties involved acknowledged how much animals meant to Thomas. When Thomas' wife, Anna, died on Christmas Day in 2015, her obituary mentioned the love she held for the "innumerable animals for which she cared for over the years." It also mentioned that, in lieu of flowers, she wished for people to donate to the Connecticut Humane Society.

Michelle attended Anna's funeral with her mother. Rudolph, however, did not attend. Anna's funeral marked the moment when David and his children noticed substantial changes in Thomas' behavior. Although he had been out of the military for several decades, he showed up to Anna's funeral in his military uniform, which was strange to some of the grandchildren. At her wake, Thomas remained in his military uniform and continually asked where Anna was while holding her ashes.

Although Thomas' mental capacity significantly declined after Anna died, he had been exhibiting a decline in mental capacity since at least 2011. For example, while attending a birthday party for Steven's daughter, Thomas did not recognize Steven. On another occasion, during a dinner at a restaurant organized by two of

Thomas' grandsons, Thomas had difficulty remembering who some of his grandchildren were and where they were dining. Thomas also repeatedly asked the same questions. Thomas continued to exhibit strange behavior that was indicative of diminished mental capacity.[3]

As of March 1, 2016, Thomas' primary care practitioner, Terrence Doherty, evaluated Thomas and found that he had mild cognitive impairment and explained that "[h]e was not fully oriented to person, place or time." Doherty was concerned that Thomas' decline in cognition and depression stemmed from the recent loss of his wife. In April, 2016, Doherty again noted that Thomas' mental capacity was impaired and prescribed medication to help assuage what he thought was the cause of his diminished mental capacity. Doherty met with Thomas again on June 10 and July 11 of that same year and again found his memory to be impaired. His notes reflected his belief that Thomas may be suffering from dementia.

Not long after Anna died, David began handling Thomas' affairs. Thomas had multiple bank accounts, from which David used to write checks to pay for bills and similar expenses. There came a time, however, when Thomas began to question David's financial expenditures and withdrawals. Thomas decided to reach out to Rudolph for help managing his finances. The defendants then brought Thomas to Attorney Wade Jensen, who had previously done work for Rudolph. Michelle called to make the initial appointment, explaining that Thomas needed a power of attorney. Jensen's staff who spoke with Michelle made a notation in the office file that "[i]t sounds like he may also need a conservator, but not quite sure." Jensen met with Thomas and the defendants to prepare

---

[3] Another one of Thomas' grandsons testified that, on one occasion, "[Thomas] was telling me stories. . . . And he went into telling me how these C-130s fly over his house. And he runs out with some flags in the yard and waves at them. And they spin around and fly back closer . . . . And then out of nowhere he just looks at me and says . . . 'I think I'm losing my f'ing mind. I don't know what's going on. I'm not going to fix it. I'm just going to go along with it.' And then he goes right back into the story about the airplane flying overhead."

a living will and power of attorney on April 21, 2016. Jensen met with the parties once again on May 5, 2016, to inform David why the defendants were appointed as Thomas' attorneys-in-fact, but David did not show up for the appointment.

Following that meeting, Michelle called the East Haddam Police Department and accused David of stealing money from Thomas. David argued that he did not steal any money from his father and that, instead, it was his father who continually insisted that David take the money, although he refused. On May 9, 2016, Officer Russell Gingras of the East Haddam Police Department arrived at Thomas' residence to meet with Thomas and Michelle regarding David's financial misdeeds. Thomas mentioned to Gingras that he was upset that David stole from him and mentioned changing his will.[4] Gingras also noted that Thomas was exhibiting the beginning stages of dementia. Approximately two weeks later, Gingras received a call from Michelle that Thomas had discussed it with his family and wished to press charges against David. David was subsequently arrested and pleaded nolo contendere to the charges.[5]

Upon Jensen's advice, Thomas applied for a voluntary conservatorship on June 1, 2016, to circumvent David's attempt to obtain an involuntary conservatorship. Not long after, on June 21, 2016, the Probate Court appointed the defendants as coconservators of Thomas' estate and person. During the hearing, Rudolph told the court that Thomas wanted to create a new will and asked what the process would be for doing so. Six days after the hearing, Thomas and the defendants returned to Jensen's office, where Thomas executed the 2016 will, in which he bequeathed 100 percent of his estate to Rudolph. Jensen believed Thomas was competent to execute his

---

[4] At trial, Gingras did not recall meeting Thomas alone or asking him if he felt safe or if he was on medication.

[5] David was charged with one count of larceny in the second degree in violation of General Statutes § 53a-123 and one count of attempt to commit larceny in the fourth degree in violation of General Statutes §§ 53a-49 and 53a-125. He subsequently was convicted of larceny in the fourth degree in violation of § 53a-125.

will and did not observe any evidence of undue influence. Additionally, Jensen did not inquire, and was not made aware of, whether the prior will contained any beneficiaries, and the defendants did not inform Jensen about the 2011 will or about Thomas and Anna's animal trust. As found by the court, "Jensen had little to no independent recollection of the events surrounding the meetings with the parties or the drafting of the documents, including the 2016 will."[6]

Thomas ultimately died on November 13, 2018. Neither defendant notified David that his father had died. Thomas' obituary did not mention his son David or Thomas' grandchildren. Thomas' death certificate showed that he suffered from dementia and Alzheimer's disease for three years prior to his death.

On November 27, 2018, Michael filed the 2011 will with the Probate Court for admission. Two days later, on November 29, 2018, the defendants filed the 2016 will with the Probate Court. David and a charitable organization named as a beneficiary in the 2011 will thereafter filed an objection to the admission of the 2016 will on the grounds that, inter alia, Thomas lacked testamentary capacity to execute the 2016 will and the 2016 will was executed under the undue influence of Rudolph.

Following an evidentiary hearing, the Probate Court issued a decree that admitted the 2016 will to probate. The Probate Court concluded that the objecting parties had failed to sustain their burden of proving by clear and convincing evidence any of the elements required to establish undue influence. The Probate Court also concluded that, although there was evidence that Thomas suffered from cognitive decline, the proponents of the 2016 will nevertheless proved by a preponderance of the evidence that Thomas had the requisite capacity to execute his 2016 will.

---

[6] "Jensen admitted that during his deposition he [had] testified that it was likely that Rudolph gave him a note indicating that Thomas wanted to leave everything to Rudolph. On cross-examination at trial, [Jensen] testified that he believed it was Thomas who gave him the note."

The original plaintiffs thereafter filed an appeal with the Superior Court from the Probate Court's decree admitting the 2016 will.[7] The court, *S. Connors, J.*, conducted a three day trial de novo during which the court heard testimony from, inter alia, the plaintiffs; the defendants; Jensen; Gingras; Breanna Mehmet, a witness to the 2016 will; and two of Thomas' other grandchildren, Thomas Bartunek and Brittany Benedict. The court issued a memorandum of decision in which it rendered judgment for the plaintiffs. The court found, contrary to the decision of the Probate Court, that Thomas lacked the requisite testamentary capacity to execute the 2016 will and that the 2016 will was the result of the defendants' undue influence over Thomas. The court thus overruled the decree of the Probate Court, and this appeal followed.

I

The defendants first claim that the court improperly determined that Thomas lacked testamentary capacity at the time that he executed the 2016 will. Specifically, the court concluded that the defendants failed to establish that Thomas had testamentary capacity at the time he executed the 2016 will because the disposition of his 2016 will was unnatural and there was no attempt to determine his testamentary capacity at the time of the 2016 will's execution.[8] The defendants argue that the reasons underlying the court's conclusion were "based on either [erroneous] factual finding[s] or a misapplication

---

[7] In addition to the probate appeal, the operative second amended complaint filed with the Superior Court also alleged three counts against the defendants sounding in fraud, unjust enrichment, and tortious interference with an expected inheritance. The court, *Sicilian, J.*, granted summary judgment in favor of the defendants on these tort counts, concluding that they were barred by the applicable three year statute of limitations. The plaintiffs have not filed a cross appeal challenging that ruling.

[8] In the context of a will contest in which undue influence is raised, a natural disposition refers to a disposition that favors the natural objects of a testator's bounty—those who would inherit the testator's estate in the absence of a will. See *Salvatore* v. *Hayden*, 144 Conn. 437, 441, 133 A.2d 622 (1957). Anything that deviates from this norm would typically be, on its face, an unnatural disposition.

of the law." Having thoroughly reviewed the underlying record, we conclude that the defendants have failed to prove that the court's conclusion was not legally and logically correct and supported by facts in the record. We, therefore, reject this claim.

"An appeal from a Probate Court to the Superior Court is not an ordinary civil action. . . . When entertaining an appeal from an order or decree of a Probate Court, the Superior Court takes the place of and sits as the court of probate. . . . In ruling on a probate appeal, the Superior Court exercises the powers, not of a constitutional court of general or common law jurisdiction, but of a Probate Court. . . . The function of the Superior Court in appeals from a Probate Court is to take jurisdiction of the order or decree appealed from and to try that issue de novo. . . . Thereafter, upon consideration of all evidence presented on the appeal which would have been admissible in the [P]robate [C]ourt, the [S]uperior [C]ourt should exercise the same power of judgment which the [P]robate [C]ourt possessed and decide the appeal as an original proposition unfettered by, and ignoring, the result reached in the [P]robate [C]ourt." (Internal quotation marks omitted.) *Wolfel* v. *Wolfel*, 218 Conn. App. 760, 766–67, 292 A.3d 1261, cert. denied, 348 Conn. 902, 301 A.3d 528 (2023).

"What constitutes testamentary capacity is a question of law. . . . To make a valid will, the [testator] must have had mind and memory sound enough to know and understand the business upon which [he] was engaged, that of the execution of the will, at the very time [he] executed it. . . . Whether [he] measured up to this test is a question of fact for the trier." (Internal quotation marks omitted.) *Bassford* v. *Bassford*, 180 Conn. App. 331, 340, 183 A.3d 680 (2018). Therefore, we review the court's findings of fact that support its conclusion under the clearly erroneous standard. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is

left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Riscica* v. *Riscica*, 101 Conn. App. 199, 205, 921 A.2d 633 (2007). "We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) Id.

The burden of proof in disputes over testamentary capacity is always on the proponent of the will, i.e., the party offering the will for admission to probate. See *Pastir* v. *Bielski*, 174 Conn. 193, 194, 384 A.2d 367 (1978) ("Due execution and testamentary capacity are statutory issues . . . and the burden of proof as to each is upon the proponent [of the will]. This remains so even though the contestant . . . affirmatively pleads lack of due execution and lack of testamentary capacity" or "whether in the appeal from probate the proponent is the appellee or the appellant." (Citation omitted; footnote omitted; internal quotation marks omitted.)). "While there is a presumption of sanity in the performance of legal acts, the party that presents a will still bears the burden of going forward with his proof, and only then does the burden shift to the opponents to prove incapacity. . . . [A]n individual may possess the mental capacity necessary to make a will although incapable of transacting business generally. . . . The minimum level of mental capacity required to make a will is less than that necessary to make a contract or a deed. . . . Likewise, less mental capacity is required for the testator to make a will than to carry on business transactions generally, or ordinary business affairs." (Citations omitted; internal quotation marks omitted.) *Deroy* v. *Estate of Baron*, 136 Conn. App. 123, 128, 43 A.3d 759 (2012). "Our law provides that it is a testator's capacity at the time of the will's execution that is relevant. The fundamental test of the [testator's] capacity to make a will is [his] condition of mind and memory at the very time when [he] executed the instrument. . . . While in determining the question as to the mental capacity of a testator evidence is received

of his conduct and condition prior and subsequent to the point of time when it is executed, it is so admitted solely for such light as it may afford as to his capacity at that point of time and diminishes in weight as time lengthens in each direction from that point." (Internal quotation marks omitted.) *Holloway* v. *Carvalho*, 206 Conn. App. 371, 385, 261 A.3d 57, cert. denied, 339 Conn. 911, 261 A.3d 746 (2021). Ultimately, the test for testamentary capacity "in its simplest terms is that the testator must have mind and memory sound enough to enable him to know and understand the business upon which he is engaged, that is, the execution of his will at the very time he executes it." *Atchison* v. *Lewis*, 131 Conn. 218, 219–20, 38 A.2d 673 (1944).

Here, the defendants, as the proponents of the will, had the burden of proving that Thomas had testamentary capacity at the time of the execution of the 2016 will. The court found, and the record supports, that there was significant evidence supporting the conclusion that Thomas lacked testamentary capacity when he executed the 2016 will because he was experiencing cognitive decline prior to and contemporaneously with the execution of his 2016 will. The defendants' argument to the contrary relied on the testimony of three key witnesses that they claim supports a conclusion that Thomas had testamentary capacity at the time he executed the 2016 will. Additionally, the defendants argued that the disposition of his estate was natural. The court, however, found that those witnesses' testimony did not support the defendants' arguments and that the disposition of property in the 2016 will was unnatural. See *Trella* v. *Prestoff*, 128 Conn. 337, 340, 22 A.2d 638 (1941).[9]

In support of their claim, the defendants introduced into evidence the deposition testimony of Doherty, who

[9] In *Trella*, our Supreme Court upheld a finding of lack of testamentary capacity on the basis of, inter alia, the decedent's unnatural disposition of her property. *Trella* v. *Prestoff*, supra, 128 Conn. 340. The defendants in *Trella* hired a lawyer to prepare a will for their mother, the decedent, with the intent of restricting the plaintiff's inheritance. Id., 339. The attorney directed the decedent's hand to sign the will. Id. Three days

had assessed Thomas' memory on multiple occasions, including approximately two weeks before the execution of the 2016 will. By March 1, 2016, Thomas had mild cognitive impairment based on his Mini-mental State Examination (MMSE) score of 21 out of 30.[10] Doherty believed that Thomas was suffering from pseudodementia, which he described as "a treatable form of cognitive decline." He recommended that Thomas start medication and scheduled a follow up visit for April 7, 2016. At the April visit, his MMSE was one point lower than the previous visit. Thomas was tested again on June 10, 2016, and his MMSE showed that he was at the threshold for what is considered "normal" cognitive functioning. On that same day, Doherty also noted that Thomas' "[m]emory was impaired," that he was "[n]ot oriented to time, place, and person" and that he was suffering from "[s]enile dementia which is worsening." In the weeks following the execution of the 2016 will, Thomas was admitted to an emergency department, where his medical records appeared to contain "conflicting notation of advanced cognitive deficits . . . ." Doherty also stated that there could be day-to-day variations in Thomas' cognition, with days of lucidity and days of disorientation. Ultimately, although it was Doherty's medical opinion that Thomas had sufficient cognition to execute a will, he also testified in the Probate Court that "the period of February to July, 2016, was a period marked by [Thomas'] decline in health with a gradual decline in cognition."

The defendants also introduced into evidence Jensen's deposition, in which he testified that the preparation and execution of the 2016 will took roughly "two hours." Jensen had met with Thomas and the defendants before

---

later, the decedent died of a disease that affected her mental condition. Id., 340. The court found that it was unnatural for the decedent to cut the plaintiff from her will entirely, even though the two were cordial before her death and the plaintiff was her only daughter. Id.

[10] "Of a total possible score of 30, a normal mean score on the [MMSE] is around 27, while the mean score for individuals with dementia is near 10. Psychologically depressed people, including those with pseudodementia, generally score between 19 and 25." 17 Am. Jur. 3d 219, Proof of Facts § 9 (2025).

the creation of the will to execute a power of attorney and appointment of health care representative. Those documents were executed on April 21, 2016, and "enabl[ed] [Rudolph] to work on [Thomas'] behalf." Although Jensen made no inquiries into Thomas' mental state at the time, he did note that Thomas was clearly not able to drive and that "he was relatively feeble at that time." On the day the 2016 will was drafted, Jensen had the defendants leave the office while he went through the details of the will with Thomas. During this time, Jensen did not discuss Thomas' 2011 will because Jensen was not aware of its existence. Furthermore, Jensen was never made aware of Thomas' Alzheimer's disease treatment or his mental decline, nor did he check Thomas' medical records or record Thomas during the discussion due to fears that, in any potential litigation, attorneys would "find some quirk or something going on . . . ." Throughout the entire process, Jensen never made Thomas aware that he previously had drafted a will for Rudolph, which he seemingly had forgotten at the time of his deposition.

The defendants argue that the trial testimony of Gingras also supports the contention that Thomas had the mental capacity to execute his 2016 will. The defendants direct us to Gingras' testimony that "Thomas was aware . . . of what was going on . . . ." This same witness, however, also testified that "Thomas was exhibiting the beginning stages of dementia" and that "the family was in the process of establishing an executive for his affairs." Additionally, Gingras could not confirm whether he interviewed Thomas in the presence of the defendants. It was only after Thomas spoke with his family that he decided to move forward with the criminal investigation against David.

The defendants also rely on the Probate Court's ruling on Thomas' application for voluntary conservatorship to establish his testamentary capacity. That ruling, however, did not consider any of his medical ailments. The Probate Court only reviewed the documents granting power of attorney to the defendants and the health care representative designation. Neither of these documents

make any mention of Thomas' Alzheimer's disease or his pseudodementia. The Superior Court's review in an appeal from the Probate Court is de novo, and, thus, we defer to the findings of the Superior Court, so long as there is evidence in the record to support them. The Superior Court found that the Probate Court's approval of Thomas' application for a voluntary conservator had little bearing on whether Thomas had testamentary capacity to execute his 2016 will. The defendants claim that the proximity of this hearing to the execution of the will renders the court's findings clearly erroneous. However, as Doherty testified, Thomas' mental state varied from day to day.

On the basis of our review of the record, we conclude that the court's finding that Thomas lacked testamentary capacity when he executed the 2016 will was not clearly erroneous because there was evidence in the record to support the court's factual findings with respect to the three witnesses, and we are not left with the definite and firm conviction that a mistake has been made. The court noted that "Jensen's actions are closer to those of the attorney in [*Stanton* v. *Grigley*, 177 Conn. 558, 418 A.2d 923 (1979)]." The court in *Stanton* found that the plaintiff solicited the help of his own attorney to draft the testator's will, one of the testator's sons observed his father's "'failing health,'" and the testator failed to identify his daughter whom he saw frequently. Id., 559−61. In *Stanton*, these facts were enough to establish that the plaintiff failed to meet the burden of proof for testamentary capacity. Id., 564−65. In light of *Stanton*, the court's findings with respect to Jensen's actions were well supported by the facts in the record. The court found that "Jensen previously drafted a will for a beneficiary of the new will and had no prior relationship with Thomas and did not take the time to meet with Thomas outside of the presence of the defendants for more than a few minutes."

Although the court did not make any explicit credibility findings with respect to Doherty or Gingras, the court impliedly assessed their credibility. These witnesses'

testimony, even if deemed credible, was not enough to necessitate a finding that Thomas had testamentary capacity when he executed the 2016 will. As stated previously in this opinion, "[w]e must defer to the trier of fact's assessment of the credibility of the witnesses . . . ." (Internal quotation marks omitted.) *Riscica* v. *Riscica*, supra, 101 Conn. App. 205. Despite Doherty's deposition testimony that Thomas had capacity to execute the 2016 will, his testimony provided enough countervailing evidence to logically support the court's conclusion that Doherty's testimony was not sufficient to establish testamentary capacity. The testimony of Gingras and the Probate Court's order regarding Thomas' voluntary conservatorship do not undermine the reasonableness of the court's ruling. After considering the entirety of the record before us, we are not convinced that the court's findings were clearly erroneous, nor are we left with the definite and firm conviction that a mistake has been made.

The defendants also argue that the disposition of Thomas' property in the 2016 will was not "unnatural" and thus did not evince a lack of testamentary capacity. The court disagreed, relying on *Trella* v. *Prestoff*, supra, 128 Conn. 337. In *Trella*, the court found that the disposition of a testatrix's will was unnatural. Id., 340. While the testatrix was in a decaying physical and mental state, the defendants hired a lawyer to execute a new will, which excluded the plaintiff. Id., 339. Three days later, the testatrix died. Id., 340. The Supreme Court upheld the finding of the trial court that the testatrix did not have testamentary capacity, in part because the disposition of her property was unnatural. Id. The Supreme Court determined that "[t]he trial court might have found that it would be an unnatural disposition of [the testatrix's] property for her to cut off the plaintiff entirely although she was her only daughter, was on cordial terms with her and had been promised an equal share of her estate in return for the release given of the interest in her father's estate." Id.

Thomas' 2011 will made specific bequests of his property in the event of his death. The will stipulated that, if his wife should predecease him, then 50 percent of the property in his estate should go to the Anna and Tom Bartunek Animal Fund. Thomas also made explicit bequests for each of his grandchildren. The remainder of the estate would have been divided as follows: 35 percent to David, 5 percent to Thomas, 5 percent to Brianna Bartunek, 5 percent to Michael, and one dollar to Steven.

The 2016 will is substantially different from the 2011 will. It begins with an acknowledgement that Thomas' wife predeceased him and that he has one child, David. It goes on to bequeath Thomas' entire estate, including all possessions owned and any residual, to Rudolph. It includes a provision that a memorandum containing Thomas' wishes with regard to the disposition of his personal property may be included with the will. The memorandum, though it should be respected, cannot affect "the absolute nature of the bequests made" with respect to any property owned by Thomas. Rudolph also is named as executor of the will in addition to being its sole beneficiary. There were no provisions included that would bequeath any property to the fund Thomas and his wife had sought to create in the 2011 will, nor were there any provisions that would bequeath any property to any of his grandchildren.

The court determined that the underlying facts supported the conclusion that the disposition of Thomas' property was unnatural. It concluded that "it would be an unnatural disposition of Thomas' property to cut off his grandchildren and the animals he loved . . . . [H]is grandchildren remained on cordial terms with him, and he told his late wife that he would bequeath a portion of his estate to the benefit of those animals." The court found that David and his children all had a loving relationship with Thomas. Doherty even testified that Thomas "[v]alued his farm and his animals more than anything." As was stated previously, we must defer to the trier of fact's assessment of the credibility of witnesses.

*Riscica* v. *Riscica*, supra, 101 Conn. App. 205. Accordingly, because the court's findings are supported by facts in the record and we are not left with the definite and firm conviction that a mistake has been made, we reject the defendants' claim that the court improperly found that Thomas lacked testamentary capacity when he executed the 2016 will.

## II

The defendants also claim that the court made erroneous factual findings in support of its conclusion that Thomas was unduly influenced. They argue that the court's finding that Thomas was suffering from Alzheimer's disease and dementia, which would make him more susceptible to influence, was clearly erroneous. They also argue that the mere opportunity to exert influence is not enough, there was a lack of evidence indicating an intent by the defendants to influence Thomas, and, on its face, the 2016 will does not support a finding of undue influence. The court properly determined that each element of undue influence was met after considering the testimony of the witnesses and the distinct differences in the terms of the 2011 will and the 2016 will. We reject the defendants' claim that the court's ruling was made on the basis of clearly erroneous factual findings.

As previously noted in this opinion, "[a]ppellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses." (Internal quotation marks omitted.) *Holloway* v. *Carvalho*, supra, 206 Conn. App. 388. "Ordinarily, the burden of proof on the issue of undue influence rests on the one alleging it . . . ."[11]

[11] "In will contests, we recognize an exception to this principle when it appears that a stranger, holding toward the testator a relationship of trust and confidence, is a principal beneficiary under the will and that the natural objects of the testator's bounty are excluded. . . . The burden of proof, in such a situation, is shifted, and there is imposed upon

(Internal quotation marks omitted.) Id. Therefore, in the present case, the burden of proof rests with the plaintiffs.

"Undue influence is the exercise of sufficient control over a person, whose acts are brought into question, in an attempt to destroy his [or her] free agency and constrain him [or her] to do something other than he [or she] would do under normal control. . . . It is stated generally that there are four elements of undue influence: **(1)** a person who is subject to influence; **(2)** an opportunity to exert undue influence; **(3)** a disposition to exert undue influence;[12] and **(4)** a result indicating undue influence. . . . Relevant factors include age and physical and mental condition of the one alleged to have been influenced, whether he [or she] had independent or disinterested advice in the transaction . . . consideration or lack or inadequacy thereof for any contract made, necessities and distress of the person alleged to have been influenced, his [other] predisposition to make the transfer in question, the extent of the transfer in relation to his [or

the beneficiary the obligation of disproving, by [clear and convincing evidence], the exertion of undue influence by him." (Internal quotation marks omitted.) *Holloway* v. *Carvalho*, supra, 206 Conn. App. 388. This is not the case here, however, because the court did not find that the test was met to shift the burden, and neither party claims that as error on appeal.

[12] This court previously has affirmed a ruling that a will, changed at the decedent's request due to frustrations with the plaintiff, was not the result of undue influence. See *Larocque* v. *O'Connor*, 90 Conn. App. 156, 165, 876 A.2d 1229 (2005). In *Larocque*, the decedent made it clear that she was frustrated with the plaintiff's actions. Id., 167. At the decedent's request, the defendant scheduled an appointment for the decedent to meet a lawyer and change the will. Id., 158. Furthermore, after the drafting of the new will, the decedent gave the plaintiff three months to change her behavior before executing the new will. Id. Additionally, the attorney's actions significantly mitigated any potential claim for undue influence. Id., 166–67. The attorney used the decedent's acquaintances as witnesses, obtained a statement from the decedent's doctor that the decedent was of sound mind, included the decedent's reasons for disinheriting the plaintiff in the will, recorded his conversations with the decedent and the witnesses and spoke to the plaintiff's attorney to detail the decedent's frustrations with the plaintiff. Id. Under those circumstances, this court affirmed the trial court's finding that these facts clearly established that the defendant lacked a disposition to influence the decedent. Id., 167.

her] whole worth . . . failure to provide for all of his [or her] children in case of a transfer to one of them, active solicitations and persuasions by the other party, and the relationship of the parties." (Footnote added; internal quotation marks omitted.) *Bassford* v. *Bassford*, supra, 180 Conn. App. 354.

"The existence and exercise of such undue influence is not often susceptible of direct proof. It is shown by all the facts and circumstances surrounding the testatrix, the family relations, the will, her condition of mind, and of body as affecting her mind, her condition of health, her dependence upon and subjection to the control of the person influencing, and the opportunity of such person to wield such an influence. Such an undue influence may be inferred as a fact from all the facts and circumstances aforesaid, and others of like nature that are in evidence in the case, even if there be no direct and positive proof of the existence and exercise of such an influence." (Internal quotation marks omitted.) *Lee* v. *Horrigan*, 140 Conn. 232, 238–39, 98 A.2d 909 (1953). Put differently, "[w]here there is no direct evidence of influence a factual foundation supportive of a reasonable inference that, but for the plaintiff's actions, the testator would have made a different disposition, is sufficient to sustain a finding of undue influence." *Stanton* v. *Grigley*, supra, 177 Conn. 565.

The court began its analysis by addressing the first prong of the undue influence test. The court determined that the same facts found to establish that Thomas lacked testamentary capacity also established that Thomas was susceptible to undue influence. The court found that Thomas was severely depressed in the time before he executed his will. This fact is corroborated by the testimony of witnesses for the defendants and for the plaintiffs.

Michelle testified that she "thought that [Thomas] had some kind of depression from Anna passing away" and further mentioned that he was prescribed medication for his depression. Her testimony was supported by

Doherty's deposition, in which he testified that Thomas' depression and dementia-like symptoms were indicative of "pseudodementia or false dementia." Thomas' grandchildren testified that he had been suffering from some form of mental incapacity since at least 2011.

Michael testified that he and one of his brothers organized a dinner for all the siblings and their grandparents. He testified that during that dinner, Thomas was having difficulty remembering all his grandchildren and where they were dining. He also testified that Thomas would repeatedly ask him the same questions. Shortly after Anna died, Michael noted that Thomas' home was in an unlivable condition. While he was there, he also noted that Thomas had likely soiled the pants he was wearing multiple times.

Michael further testified that he, his father, and his stepmother would bring Thomas food for each day of the week, with the containers labeled so that he would remember to eat. He testified that Thomas was simply not taking care of himself the same way that he used to. Steven testified that Thomas did not recognize him even though he was at a birthday party for Steven's daughter. Although the court did not explicitly find that this testimony was credible, we conclude that a fair reading of the court's memorandum of decision indicates that it implicitly found Steven's testimony credible. The court found that Thomas was suffering from dementia and Alzheimer's disease since at least 2015, was severely depressed following the death of his wife, and was prescribed medication to address his depression. We conclude that the court had ample evidence to find that Thomas was susceptible to undue influence.

The court next addressed prongs two and three of the test, namely, whether the defendants had the opportunity and disposition to influence Thomas, which it found they did. The facts that established this have been stated previously in this opinion. Specifically, the court found that the defendants had the opportunity to influence as they were serving as Thomas' coconservators. Additionally,

the court found that it was Rudolph who inquired about how to change Thomas' will, and Rudolph even brought Thomas to the attorney Rudolph had previously used. Lastly, the 2016 will bequeathed Thomas' entire estate to Rudolph. The court's findings with respect to the second and third elements of this test were supported by the record.

The last element is whether the resultant will, on its face, is indicative of undue influence. As was previously mentioned, Thomas' 2011 will included his son, David, and each of David's children. It also had a provision that bequeathed 50 percent of his estate to an animal fund created by Thomas and Anna. Conversely, his 2016 will contains none of these provisions. Instead, the new will gave Rudolph the entirety of Thomas' estate. There was no evidence in the record to indicate that Thomas' relationship with his grandchildren or animals changed to such an extent that he would write them out of the 2016 will. Additionally, there is no evidence that Jensen discussed removing Thomas' grandchildren or the animal fund from the 2016 will. Therefore, because the court's conclusion that the plaintiffs met their burden of proof with respect to undue influence is supported by significant evidence in the record and we are not left with the definite and firm conviction that a mistake has been made, we reject the defendants' final claim.

The judgment is affirmed.

In this opinion the other judges concurred.